**CITY OF SALINA, KANSAS, Plaintiff,**

v.

**MARYLAND CASUALTY COMPANY, Defendant.**

No. 93–4005–DES.

United States District Court, D. Kansas.

April 29, 1994.

David D. Moshier, J. Stan Sexton, Brian Wilson Wood, Hampton, Royce, Engleman & Nelson, Salina, KS, for City of Salina, KS.

Charles W. Hess, Smith, Gill, Fisher & Butts, Kansas City, MO, E. Charles Dann, Jr., Stephen E. Marshall, Goodell, DeVries, Leech & Greyheir, Baltimore, MD, for Maryland Cas. Co.

### MEMORANDUM AND ORDER

SAFFELS, District Judge.

## I. INTRODUCTION

This matter is before the court on the following three motions: (1) plaintiff City of Salina's ("City") motion for summary judgment (Doc. 64); (2) defendant Maryland Casualty Company's ("Maryland Casualty") motion for summary judgment (Doc. 65); and (3) City's motion to review magistrate's order (Doc. 70).[1]

In this action, City seeks a declaratory judgment regarding Maryland Casualty's duty to defend and indemnify City under the terms of an insurance contract. City also seeks further monetary relief based on the declaratory judgment. Specifically, City seeks compensation for costs it incurred defending, and subsequently satisfying the judgment entered in, a case brought when alkaline wastewater from City's sewer backed up into a residence ("the Eisele litigation"). In support of their summary judgment motions, the parties make the following general arguments. City argues that the insurance contract required Maryland Casualty to defend and indemnify City in the Eisele litigation. City also argues that it is entitled to attorneys' fees under K.S.A. 40–256 because Maryland Casualty's refusal to defend or indemnify was without just cause or excuse. Maryland Casualty argues that it is obligated neither to defend nor indemnify City because the claims asserted clearly fall within the contract's "pollution exclusion."

---

1. Maryland Casualty also moves for a hearing (Doc. 68) on its motion for summary judgment. Because the court has determined that oral argument would not be helpful in resolving the issues, Maryland Casualty's motion has been decided on the basis of the parties' written memoranda. D.Kan.Rule 206(d). Maryland Casualty's motion for a hearing is therefore denied.

After examining the record submitted by the parties, and the attached memoranda of law, the court (1) denies City's motion for summary judgment (Doc. 64); (2) grants Maryland Casualty's motion for summary judgment (Doc. 65); and (3) denies City's motion to review magistrate's order (Doc. 70).

## II. BACKGROUND

Ramaco, Incorporated ("Ramaco") is a Kansas corporation. On January 1, 1990, Ramaco's business involved cleaning pizza pans at its facility on West Elm Street in Salina, Kansas. During the cleaning process, Ramaco submerged pizza pans in tanks containing a concentrated sodium hydroxide solution. The pans were then removed and rinsed.

Prior to January 1, 1991, City enacted a Pretreatment Ordinance that prohibited industries from discharging into City's sewer solutions with a pH in excess of 9. Ramaco was subject to the Pretreatment Ordinance. Ramaco could not legally discharge its cleaning solution into City's sewer because the solution had a pH in excess of 9.

Ramaco never intentionally dumped spent cleaning solution into City's sewer. After the cleaning solution had been used, it was taken off-site to Tony's Pizza where it was treated and then disposed of as a topical fertilizer.

Ramaco ordinarily discharged only two types of waste into City's sewer: (1) domestic waste from restrooms and sinks; and (2) rinse water following pretreatment and subject to Ramaco's discharge permit. The rinse water was not the cleaning solution.

On January 1, 1990, a pipe from one of Ramaco's cleaning tanks burst. Approximately 1,500 gallons of cleaning solution escaped. The cleaning solution flowed down a Ramaco drain, through Ramaco's private lateral sewer line, and into City's main sewer line. The presence of sodium hydroxide elevated the pH of the wastewater in City's sewer line to at least 12.

While in the City's sewer, the solution coagulated and clogged the line. City employees attempted to unclog the line. Additionally, the City employees performed work on private lateral lines affected by the coagulated substance.

At the time of the discharge, Debbie and Clyde Eisele, along with their daughter Crystal Aldridge, lived approximately one block south of the Ramaco facility. The Eiseles claimed that wastewater from City's sewer backed up into their residence. On July 31, 1991, the Eiseles sent City a demand letter in which they claimed property damage and bodily injury as a result of the presence in their residence of wastewater with an elevated pH.

City had a claims-made comprehensive general liability ("CGL") policy issued by Maryland Casualty.[2] The CGL policy was effective from June 1, 1991, through June 1, 1992.

On August 8, 1991, following receipt of the Eiseles' demand letter, City provided Maryland Casualty with notice of the claim. City sought defense and indemnification under its CGL policy. City attached a copy of the Eiseles' letter to the notice of claim.

City's CGL policy contained a standard Insurance Service Office, Incorporated ("ISO") "pollution exclusion" which covered claims for bodily injury or property damage arising from pollution. In part, the "pollution exclusion" provides as follows:

2. **Exclusions.**

This insurance does not apply to: . . .

> f. (1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants:
>
> (a) At or from premises you own, rent or occupy;
>
> (b) At or from any site or location used by or for you or others for the handling, storage, disposal, processing or treatment of waste;
>
> (c) Which are at any time transported, handled, stored, treated, disposed of, or

---

**2.** In response to the court's April 18, 1994, Memorandum and Order, the parties stipulated (Doc. 86) that the insurance contract at issue here is

CGL coverage form CG 00 02 02 86. City submitted form CG 00 02 02 86 as an exhibit in support of its summary judgment motion.

processed as waste by or for you or any person or organization for whom you may be legally responsible; or

(d) At or from any site or location on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations:

(i) if the pollutants are brought on or to the site or location in connection with such operations; or

(ii) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize the pollutants.

. . . . .

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

Charles Endres, Jr., Environmental Claims Counsel for Maryland Casualty, sent a letter on behalf of Maryland Casualty rejecting City's August 8, 1991, demand for defense and indemnification. Mr. Endres based Maryland Casualty's denial on his belief that paragraph one of the "pollution exclusion" applied.

In November of 1991, City made a second demand for defense and indemnification. Maryland Casualty rejected this demand in a November 4, 1991, letter written by Mr. Endres.

On December 27, 1991, the Eiseles sued City in the United States District Court for the District of Kansas, Case No. 91–2477–V. City retained the services of its city attorney to defend it against the Eiseles' claims.

During discovery, City continued to demand defense and indemnification. In letters dated January 14, 1992, and February 28, 1992, Maryland Casualty rejected these additional demands.

After partial discovery, City concluded that its employees failed to follow established policy to warn citizens of the properties of materials discharged into City's sewer system causing a sewer back-up. City settled with the Eiseles. The parties stipulated to an entry of judgment which contained findings of fact and conclusions of law. On September 17, 1992, a journal entry of judgment was entered regarding the Eiseles' claims.

Under the terms of the judgment, City paid the Eiseles $36,250 for damages caused by City's failure to warn them that the sewer was blocked, that the material from the sewer had an elevated pH and was caustic, and that the material could cause injury to human tissue on contact. City satisfied the judgment.

In defense of the Eiseles' claims, City incurred $38,928.36 in defense costs.

Following the September 17, 1992, judgment, City made an additional demand for reimbursement of its defense and judgment costs. Maryland Casualty denied City's demand. City then filed the instant declaratory judgment action in the District Court of Saline County, Kansas. Maryland Casualty removed to this court.

## III. SUMMARY JUDGMENT STANDARDS

 A court shall render summary judgment upon a showing that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The rule provides that "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The substantive law identifies which issues are material. *Id.* at 248, 106 S.Ct. at 2510. A dispute over a material fact is genuine when the evidence is such that a reasonable jury could find for the nonmovant. *Id.* "Only disputes over facts that might properly affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

 The movant has the initial burden of showing the absence of a genuine issue of material fact. *Shapolia v. Los Alamos National Laboratory,* 992 F.2d 1033, 1036 (10th Cir.1993). The movant may discharge its

burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the [nonmovant's] case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The movant need not negate the nonmovant's claim. *Id.* at 323, 106 S.Ct. at 2552. Once the movant makes a properly supported motion, the nonmovant must do more than merely show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Industrial Co. v. Zenith Radio,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). The nonmovant must go beyond the pleadings and, by affidavits or the depositions, answers to the interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553 (interpreting Rule 56(e)).

 Rule 56(c) requires the court to enter summary judgment against a nonmovant who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof. *Id.* at 322, 106 S.Ct. at 2552. Such a complete failure of proof on an essential element of the nonmovant's case renders all other facts immaterial. *Id.* at 323, 106 S.Ct. at 2552.

 A court must view the facts in the light most favorable to the nonmovant and allow the nonmovant the benefit of all reasonable inferences to be drawn from the evidence. *See, e.g., United States v. O'Block,* 788 F.2d 1433, 1435 (10th Cir.1986) (stating that "[t]he court must consider factual inferences tending to show triable issues in the light most favorable to the existence of those issues").

 The court's function is not to weigh the evidence, but merely to determine whether there is sufficient evidence favoring the nonmovant for a finder of fact to return a verdict in that party's favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510. Essentially, the court performs the threshold inquiry of determining whether a trial is necessary. *Id.* at 250, 106 S.Ct. at 2511.

## IV. DISCUSSION

As previously mentioned, there are three motions before the court: (1) City's motion for summary judgment (Doc. 64); (2) Maryland Casualty's motion for summary judgment (Doc. 65); and (3) City's motion to review magistrate's order (Doc. 70). The court first addresses the parties' motions for summary judgment.

### A. *The Parties' Motions for Summary Judgment*

The parties' motions for summary judgment present the following three issues: (1) Maryland Casualty's duty to indemnify; (2) Maryland Casualty's duty to defend; and (3) City's right to attorneys' fees pursuant to K.S.A. 40–256.

#### 1. *Duty to Indemnify*

 City asserts that the "insuring clause" of the CGL contract entitles City to indemnification in the Eisele suit. As the insured, City has the burden to prove that its loss falls within the CGL contract's coverage. *Security State Bank v. Aetna Cas. and Sur.,* 825 F.Supp. 944, 946 (D.Kan.1993); *Resolution Trust Corporation v. Continental Cas. Co.,* 799 F.Supp. 77, 82 (D.Kan.1992); *Clark Equipment Co. v. Hartford Acc. & Indem.,* 227 Kan. 489, 608 P.2d 903, 906 (1980); *Baugher v. Hartford Fire Ins. Co.,* 214 Kan. 891, 522 P.2d 401, 409 (1974).

Maryland Casualty does not dispute that the Eiseles' claims fall within the scope of the "insuring clause." In fact, Maryland Casualty does not even address City's discussion of the issue. Instead, Maryland Casualty argues that the contract's "pollution exclusion" clause excludes coverage. Maryland Casualty's argument assumes the existence of coverage. Accordingly, after examining City's discussion of the issue, and considering Maryland Casualty's failure even to address the issue, the court is persuaded City has carried its burden.

The essence of this case is Maryland Casualty's refusal to defend and indemnify City. Maryland Casualty supports its refusal to indemnify with only one argument: the contract's "pollution exclusion" clause plainly ex-

cludes coverage for City's loss. City argues that the "pollution exclusion" is ambiguous and, therefore, the court must construe the contract as providing coverage. Thus, the parties' dispute turns on the effect to be given the contract's "pollution exclusion" clause.

■ Under Kansas law, an insurer has the burden of proving the applicability of an exclusionary clause. *Westchester Fire Ins. Co. v. City of Pittsburg, Kan.*, 768 F.Supp. 1463, 1469 (D.Kan.1991), *aff'd*, 987 F.2d 1516 (10th Cir.1993); *U.S. Fidelity & Guaranty Co. v. Morrison Grain Co.*, 734 F.Supp. 437, 443 (D.Kan.1990), *aff'd*, 999 F.2d 489 (10th Cir.1993); *Baugher*, 522 P.2d at 409. Consequently, Maryland Casualty has the burden of proving that the "pollution exclusion" clause excludes City's loss from general coverage.

Before examining the effect of the "pollution exclusion," it is necessary to review the general rules for the construction of insurance contracts in Kansas.

■ The construction of an insurance contract is a question of law. *U.S. Fidelity*, 734 F.Supp. at 442; *Wing Mah v. United States Fire Insurance Co.*, 218 Kan. 583, 545 P.2d 366, 369 (1976) (quoting *Goforth v. Franklin Life Ins. Co.*, 449 P.2d 477, 202 Kan. 413, (1969)). If the relevant facts are admitted, the court may decide whether they come within the terms of the contract. *U.S. Fidelity*, 734 F.Supp. at 442; *Wing Mah*, 545 P.2d at 369 (quoting *Goforth*, 449 P.2d 477).

■ An insurance contract, like any other contract, must, if possible, be construed so as to give effect to the parties' intent. *Westchester Fire*, 768 F.Supp. at 1467; *Catholic Diocese of Dodge City v. Raymer*, 251 Kan. 689, 840 P.2d 456, 459 (1992); *Farm Bureau Mutual v. Old Hickory Cas.*, 248 Kan. 657, 810 P.2d 283, 286 (1991). This is to be accomplished by considering the policy as a whole and taking into account the circumstances of the parties. *Coleman Co., Inc. v. California Union Ins. Co.*, 960 F.2d 1529, 1532 (10th Cir.1992); *Reynolds v. S & D Foods, Inc.*, 822 F.Supp. 705, 707 (D.Kan. 1993).

■ Where an insurance contract is unambiguous, the court must enforce the contract as made and not make another contract for the parties. *Catholic Diocese of Dodge City*, 840 P.2d at 459; *Farm Bureau Mutual*, 810 P.2d at 286. The court must take unambiguous language in its plain, ordinary, and popular sense. *Wing Mah*, 545 P.2d at 369 (quoting *Bramlett v. State Farm Mutual Ins. Co.*, 205 Kan. 128, 468 P.2d 157 (1970)). Where there is no ambiguity, there is no need for either judicial interpretation or the application of liberal rules of construction. *American Media, Inc. v. Home Indem. Co.*, 232 Kan. 737, 658 P.2d 1015, 1019 (1983) (quoting *Goforth*, 449 P.2d at 481). That is, the court must enforce an unambiguous contract according to its terms. *Id.*

■ Like any contract, an insurance contract may be ambiguous. However, the court should not strain to create an ambiguity where, in common sense, none exists. *See, e.g., Miner v. Farm Bureau Mut. Ins. Co., Inc.*, 17 Kan.App.2d 598, 841 P.2d 1093, 1105 (1992) (noting that "[i]t [is] not a function of the trial court to create an ambiguity requiring an interpretation favorable to the insured when no ambiguity exist[s]"); *Bell v. Patrons Mut. Ins. Ass'n*, 15 Kan.App.2d 791, 816 P.2d 407, 409 (1991) (noting that the court should not strain to create ambiguity).

■ "To be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language." *Catholic Diocese of Dodge City*, 840 P.2d at 459; *Patrons Mut. Ins. Ass'n v. Harmon*, 240 Kan. 707, 732 P.2d 741, 745 (1987). Ambiguity does not arise until the application of the rules of interpretation to the face of the contract leaves it uncertain which of two or more meanings is proper. *Id.*

■ Where a contract is ambiguous, the construction most favorable to the insured prevails. *American Media, Inc.*, 658 P.2d at 1019 (quoting *Fancher v. Carson-Campbell, Inc.*, 216 Kan. 141, 530 P.2d 1225, 1229 (1975)); *Wing Mah*, 545 P.2d at 369 (quoting *Goforth*, 449 P.2d at 481). This is so because the insurer, as the one who prepared

the contract, must suffer the consequences of failing to make the terms clear. *Westchester Fire,* 768 F.Supp. at 1467. *See also Dronge v. Monarch Ins. of Ohio,* 511 F.Supp. 1, 4 (D.Kan.1979) (comparing insurance contracts to adhesion contracts); *Gowing v. Great Plains Mutual Ins. Co.,* 207 Kan. 78, 483 P.2d 1072, 1074–1075 (1971) (comparing insurance contracts to adhesion contracts).

■■■ Even though ambiguous, the language of the contract still must be construed, if possible, in a manner that gives effect to the intentions of the parties. *Dronge,* 511 F.Supp. at 4. However, the test is not what the insurer subjectively intended the terms to mean, but rather what a reasonable person in the insured's position would have understood the disputed terms to mean. *Westchester Fire,* 768 F.Supp. at 1467; *Dronge,* 511 F.Supp. at 4; *American Media, Inc.,* 658 P.2d at 1019 (quoting *Fancher,* 530 P.2d at 1229).

■■■ As previously noted, the instant case involves a dispute over the meaning of the contract's "pollution exclusion" clause. Under Kansas law, the court narrowly construes restrictions or limitations of coverage. *Bendis v. Federal Ins. Co.,* 958 F.2d 960, 962 (10th Cir.1992); *Kansas State Bank & Trust v. Emery Air Freight,* 656 F.Supp. 200, 202 (D.Kan.1987); *Baugher v. Hartford Fire Insurance Co.,* 214 Kan. 891, 522 P.2d 401, 409 (1974). If an insurer intends to restrict or limit the coverage it extends in the contract, it must do so in clear and unambiguous language. *Westchester Fire,* 768 F.Supp. at 1467; *Catholic Diocese of Dodge City,* 840 P.2d at 459; *Goforth,* 449 P.2d at 481. In-

deed, as the Kansas Supreme court has written, "[a claim] which is not clearly excluded from coverage under a general comprehensive liability insurance contract is presumed to have been included." *Arnold v. Adventure Line Manufacturing Co.,* 209 Kan. 80, 495 P.2d 1007, 1011 (1972). *See also Topeka Railway Equipment v. Foremost Ins. Co.,* 5 Kan.App.2d 183, 614 P.2d 461, 464 (1980) (same). The underlying rationale is that "the insurer, having affirmatively expressed coverage through broad promises, assumes a duty to define any limitations on that coverage in clear and explicit terms." *Westchester Fire,* 768 F.Supp. at 1467.

■■■ As City notes in its memoranda, the CGL contract contains an "absolute pollution exclusion." An absolute exclusion differs from a qualified exclusion in that the latter extends coverage where the injury or damage was caused by a "sudden or accidental" discharge of pollutants. *See, e.g., Union Mutual Fire Ins. Co. v. Hatch,* 835 F.Supp. 59, 64 (D.N.H.1993) (noting the difference); *Westchester Fire,* 768 F.Supp. at 1468 n. 7 (noting the difference); *Vantage Development Corp., Inc. v. American Env. Tech.,* 251 N.J.Super. 516, 598 A.2d 948, 952–53 (L.1991) (noting the difference). That is, unlike a qualified exclusion, an absolute exclusion contains no exception which extends coverage to a "sudden or accidental" discharge.

The absolute exclusion, in its various forms, has been the subject of much recent litigation. Courts faced with the absolute exclusion generally have concluded that it is unambiguous and excludes coverage for all claims alleging damage caused by pollutants.[3]

---

3. *See, e.g., Titan Holdings Syndicate v. City of Keene, N.H.,* 898 F.2d 265, 269 (1st Cir.1990); *American States Ins. Co. v. F.H.S., Inc.,* 843 F.Supp. 187, 190 (S.D.Miss.1994); *Union Mutual Fire,* 835 F.Supp. at 65; *LaSalle National Trust, N.A. v. Schaffner,* 818 F.Supp. 1161, 1167 (N.D.Ill.1993); *Bureau of Engraving v. Federal Ins. Co.,* 793 F.Supp. 209, 211–212 (D.Minn. 1992), *aff'd,* 5 F.3d 1175 (8th Cir.1993); *Park–Ohio Industries, Inc. v. Home Indem. Co.,* 785 F.Supp. 670, 674 (N.D.Ohio 1991), aff'd, 975 F.2d 1215 (6th Cir.1992); *Alcolac, Inc. v. California Union Ins. Co.,* 716 F.Supp. 1546, 1549 (D.Md.1989); *Guilford Industries, Inc. v. Liberty Mutual Ins. Co.,* 688 F.Supp. 792, 794 (D.Me. 1988), *aff'd,* 879 F.2d 853 (1st Cir.1989); *Titan Corp. v. Aetna Cas. and Sur. Co.,* 22 Cal.App. 457,

470, 27 Cal.Rptr.2d 476, 483 (1994); *League of Minnesota Cities Ins. Co., v. Coon Rapids,* 446 N.W.2d 419, 422 (Minn.Ct.App.1989); *Vantage Development,* 598 A.2d at 952–954; *Budofsky v. Hartford Ins. Co.,* 147 Misc.2d 691, 556 N.Y.S.2d 438, 440 (S.Ct.1990); *O'Brien Energy v. American Employers',* 427 Pa.Super. 456, 629 A.2d 957, 961–962 (1993). *But see Westchester Fire,* 768 F.Supp. at 1471; *Minerva Enterprises v. Bituminous Cas. Corp.,* 312 Ark. 128, 851 S.W.2d 403, 406 (1993); *West American Ins. Co. v. Tufco Flooring,* 104 N.C.App. 312, 409 S.E.2d 692, 697 (1991); *American Star Ins. Co. v. Grice,* 121 Wash.2d 869, 854 P.2d 622, 627 (1993) (explaining that hostile fire exception to the pollution exclusion created an ambiguity).

■ In the instant case, the underlying claim was for injury and damage caused by the back-up into the Eiseles' residence of highly alkaline wastewater from City's sewer. City seeks a declaration of coverage. Maryland Casualty, apparently relying on only f(1)(a) and f(1)(c) of the exclusion, argues that the claim is excluded from coverage.

The first question is whether the insurance contract is ambiguous. City argues that it is. Specifically, City argues that the exclusion's definition of pollutants is so broad as to render the entire exclusion ambiguous. In support, City points to Judge O'Connor's opinions in the *"Westchester, Fire* trilogy."[4] In the "trilogy," Judge O'Connor examined whether an insurance contract excluded coverage for injuries suffered by several individuals who were inadvertently sprayed with an insecticide by a City operated vehicle. The individuals sued the City. The City's insurance company denied coverage based on the insurance contract's "pollution exclusion" clause.

The "pollution exclusion" clause in *Westchester Fire* defined pollutants exactly as does the exclusion in the instant case: "[p]ollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." Judge O'Connor held that the definition's breadth rendered it ambiguous. He wrote as follows:

> the definition includes "any solid, liquid, gaseous or thermal irritant or contaminant." Westchester proposes a broad reading of "irritant or contaminant" to include any substance or chemical that allegedly causes injury to any person. Of course, there is virtually no substance or chemical in existence that would not irritate or damage some person or property. *The terms "irritant" and "contaminant,"* however, cannot be read in isolation, but

must be construed as substances generally recognized as polluting the environment. *Westchester Fire,* 768 F.Supp. at 1470 (emphasis added). Accordingly, he limited the term pollutants to mean "toxic or particularly harmful material which is recognized as such in industry or by governmental regulators." *Id.* He then concluded that malathion was not a pollutant.[5]

City relies heavily on the *"Westchester Fire* trilogy." Specifically, City seems to argue that Judge O'Connor's construction of the insurance contract in *Westchester Fire* is dispositive here. In contrast, Maryland Casualty argues that the exclusion at issue here is unambiguous and, thus, the court must enforce the contract as written. The court agrees with Maryland Casualty. After examining the instant insurance contract and the undisputed facts, the court concludes that the "pollution exclusion" is unambiguous.

In deciding that the contract is unambiguous, the court does not disapprove of *Westchester Fire.* Instead, the court notes that *Westchester Fire* involved different circumstances and a different contract. In the instant case, a highly caustic substance escaped from a City sewer and caused damage. The substance was alkaline wastewater containing sodium hydroxide effluent. The sodium hydroxide effluent elevated the wastewater's pH to at least 12. Although general, the exclusion specifically lists alkalis. There can be no reasonable doubt that alkaline wastewater with a pH of 12 constitutes the type of alkali which would be considered an "irritant or contaminant." The court is persuaded that *Westchester Fire* is distinguishable from the instant case.

Having found that the contract is unambiguous, the court must now examine the undisputed facts to determine whether coverage exists. The court must take the exclusionary clause's language in its "plain, ordinary, and

4. The three cases are (1) *Westchester Fire Ins. Co. v. City of Pittsburg, Kansas,* 768 F.Supp. 1463 (D.Kan.1991), *aff'd,* 987 F.2d 1516 (10th Cir. 1993), (2) *Westchester Fire Ins. Co. v. City of Pittsburg, Kansas,* 791 F.Supp. 836 (D.Kan.1992), *aff'd,* 987 F.2d 1516 (10th Cir.1993), and (3) *Westchester Fire Ins. Co. v. City of Pittsburg, Kansas,* 794 F.Supp. 353 (D.Kan.1992), *aff'd,* 987 F.2d 1516 (10th Cir.1993).

5. Specifically, he concluded that "[m]alathion is not itself recognized as a pollutant or hazardous substance and the activity of the City being challenged by the Radells is not a polluting activity such as waste water treatment, smokestack emissions, or dumping at a landfill." *Id.* at 1471.

popular sense." The first step is to determine whether the wastewater involved here is a pollutant.

The wastewater at issue here contained concentrated sodium hydroxide cleaning solution which spilled from a ruptured Ramaco tank.[6] The presence of the sodium hydroxide elevated the wastewater's pH to at least 12. Sodium hydroxide is an alkali. In its pure form, it has a pH of 14. The Environmental Protection Agency classifies sodium hydroxide as a "hazardous substance." *See* 40 C.F.R. §§ 302.3 and 302.4, Table 302.4. It is designated as a "hazardous substance" under § 102(a) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980. 40 C.F.R. § 302.4(a).

Vulcan Chemicals manufactures sodium hydroxide. It produces a "Sodium Hydroxide Handbook" in which employees are cautioned to wear protective clothing when working with sodium hydroxide and avoid any possibility of skin or eye contact with sodium hydroxide mists or solutions. Vulcan Chemicals also produces "Material Safety Data Sheets" concerning sodium hydroxide. These sheets provide, in part, as follows:

*Skin:* Major potential hazard—contact with skin can cause severe burns with deep ulcerations. Contact with solution or mist can cause multiple burns with temporary loss of hair at burn site. Solution of 4% may not cause irritation and burning for several hours, while 25 to 50% solutions can cause these effects in less than 3 minutes.

*Eyes:* Major potential hazard—Liquid in the eye can cause severe destruction and blindness. These effects can occur rapidly effecting all parts of the eye. Mist or dust

can cause irritation with high concentrations causing destructive burns.

*Ingestion:* Ingestion of sodium hydroxide can cause severe burning and pain in lips, mouth, tongue, throat and stomach. Severe scarring can occur after swallowing. Death can result from ingestion.[7]

The court is convinced that there can be no genuine dispute that the alkaline wastewater that invaded the Eiseles' residence is a pollutant as defined by the "pollution exclusion." Whether a substance is a pollutant depends on whether it is an "irritant or contaminant." A substance with a pH of at least 12, like the wastewater at issue here, is hazardous to individuals who came into contact with it. It is harmful to vegetation, aquatic life, and wildlife. Indeed, exposure to such a substance can destroy living organisms and is extremely harmful to humans, wildlife, and vegetation. Even the narrowest construction of "irritant or contaminant" includes a substance with such destructive properties. Thus, giving the definition its plain meaning, the caustic wastewater is clearly a pollutant. Furthermore, the definition clearly and explicitly lists "alkalis" as a specific type of covered "irritant or contaminant." Although broad, the definition mentions alkalis specifically. A natural and reasonable interpretation of the language leaves the court with no doubt as to whether alkaline wastewater with a pH of at least 12 is the type of alkali which constitutes an "irritant or contaminant.". The court will not strain to create an ambiguity here. Nor will the court rewrite the contract by construction since it is unambiguous. *Security State Bank,* 825 F.Supp. at 946 (quoting *Thomas v. Thomas,* 250 Kan. 235, 824 P.2d 971, 977 (1992)).

6. The City issued Ramaco an Industrial Wastewater Discharge permit which precluded Ramaco from discharging waste with a pH in excess of 9. Ramaco could not have discharged the solution into the sewer without violating its permit.

 Similarly, City has a Kansas Water Control Pollution permit which allows it to discharge treated waste into the Smoky Hill River. City is not allowed to discharge waste with a pH in excess of 9.

7. Contrast these warnings about sodium hydroxide with the description of malathion produced by Prentiss Drug and Chemical Company in

*Westchester Fire.* Prentiss described malathion as follows:

 MALATHION is an insecticide of low mammalian toxicity, a good knock-down effect and no residue, controlling a wide range of sucking and chewing insect pests in field, fruits, and vegetables. It ensures *no environmental pollution* and low hazard for wildlife.

*Westchester Fire,* 768 F.Supp. at 1465.

 Malathion was described elsewhere as "so safe that it is prescribed by physicians for use on humans for the control of head, body, and crab lice." *Id.* at 1465 n. 2.

In summary, the court is persuaded that it is beyond reasonable dispute that the alkaline wastewater is a pollutant. As stated above, the crux of the definition is whether a substance is an "irritant or contaminant." The general definition specifically includes "alkalis." In the instant case, the wastewater was alkaline due to the presence of a concentrated sodium hydroxide effluent. The effluent's pH exceeded the pH limit of Ramaco's Industrial Wastewater Discharge permit. The effluent also raised the wastewater's pH to a level at which it was capable of destroying living organisms. Specifically, the pH level made the wastewater extremely harmful to humans, wildlife, and vegetation. Thus, the court is persuaded that the wastewater was indisputably both an irritant and a contaminant.

Having determined that the alkaline wastewater was a pollutant, the court next must examine the exclusion's "location or activity" requirement. As previously noted, Maryland Casualty apparently limits its argument to f(1)(a) and f(1)(c) of the pollution exclusion.

In order to satisfy f(1)(a), the wastewater must have been discharged, dispersed, or released or have escaped "at or from premises" which the City owned or occupied.[8] It is undisputed that the pollutant wastewater backed-up from a City owned sewer. City seeks to avoid the exclusion by arguing that (1) the term "premises" is ambiguous and (2) the exclusion does not apply to secondary releases or discharges.

The court rejects City's argument that the term "premises" is ambiguous. "The court will not torture words to import ambiguity when ordinary meaning leaves no room for such." *Canal Ins. Co. v. Earnshaw,* 629 F.Supp. 114 (D.Kan.1985). *Cf. Titan Holdings Syndicate v. City of Keene, N.H.,* 898 F.2d 265, 269 (1st Cir.1990) (stating that "the drafter of a policy need not define each word in the policy *ad infinitum,* but may rely on the ordinary meaning of words"); *Vantage*

*Development,* 598 A.2d at 955 (stating that "failure to convert an insurance policy into a veritable thesaurus cannot serve to create ambiguity"). The court is persuaded that a municipally owned sewer system constitutes a premises which the municipality owns. Thus, the City's sewer is its premises.

City also argues that f(1)(a) does not cover secondary discharges or releases. In this regard, City argues that the exclusion does not apply because City acted merely as a conduit through which an effluent, originally released by Ramaco, flowed. City's lack of involvement in the original release is irrelevant in determining whether the exclusion is applicable. The exclusion covers an escape of a pollutant as well as a discharge. City need not have been involved with the initial discharge, the subsequent escape from its sewer is sufficient. Thus, the escape from City's sewer is the event critical to the court's analysis of f(1)(a) of the exclusion.

In conclusion, the court is persuaded that (1) the wastewater is a pollutant and (2) it escaped from premises which the City owned. Accordingly, the court finds that f(1)(a) of the "pollution exclusion" applies and, therefore, the underlying claim is excluded from coverage.

### 2. *Duty to Defend*

■ City argues that Maryland Casualty had a contractual duty to defend it in the Eisele litigation. City further argues that Maryland Casualty's refusal to defend entitles City to monetary compensation for its defense costs. Maryland Casualty denies any duty to defend.

■ An insurer's duty to defend arises by agreement. *Overbaugh v. Strange,* 18 Kan.App.2d 365, 853 P.2d 80, 82 (1993), *aff'd,* 254 Kan. 605, 867 P.2d 1016 (1994). Maryland Casualty does not dispute that the contract imposes a duty to defend. Instead, Maryland Casualty denies that the instant facts were sufficient to trigger its duty.

---

**8.** Specifically, the exclusion provides, in part, as follows:

This insurance does not apply to: ...
f.(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants:
(a) At or from premises you own, rent or occupy;....

■ In the previous section, the court held that Maryland Casualty had no duty to indemnify. The court's earlier holding does not, by itself, dispose of the question regarding Maryland Casualty's duty to defend. This is so because an insurer's duty to defend is broader than its duty to indemnify. *American Motorists Ins. Co. v. General Hosp. Corp.*, 946 F.2d 1489, 1490 (10th Cir.1991); *Johnson v. Studyvin*, 828 F.Supp. 877, 885 (D.Kan.1993) (quoting *American Motorists*); *Security State Bank v. Aetna Cas. and Sur.*, 825 F.Supp. 944, 946 (D.Kan.1993). *See also State Farm Fire and Cas. Co. v. Finney*, 244 Kan. 545, 770 P.2d 460, 466 (1989) (noting that "[t]he duty to defend and the duty to cover are not necessarily coextensive"). Thus, the court still must examine whether Maryland Casualty had a duty to defend despite the earlier holding that it had no duty to indemnify. *See MGM, Inc. v. Liberty Mutual Ins. Co.*, 253 Kan. 198, 855 P.2d 77, 79–80 (1993) (analyzing insurer's duty to defend even after determining there was no duty to indemnify). *Cf. American Motorists*, 946 F.2d at 1490 (stating that "an insurer may incur a duty to defend its insured even though it ultimately may not have an obligation to indemnify any liability that may be found against the insured").

■ Under Kansas law, an insurer has the duty to defend whenever there is a "potential of liability" under the insurance contract. *MGM, Inc.*, 855 P.2d at 79 (citing to, and quoting from, *State Farm Fire*, 770 P.2d at 466); *State Farm Fire*, 770 P.2d at 466 (citing to, and quoting from, *Spruill Motors, Inc. v. Universal Underwriters Ins. Co.*, 212 Kan. 681, 512 P.2d 403, 407 (1973)); *Spruill Motors, Inc.*, 512 P.2d at 407. When determining whether it has a duty to defend, an insurer must look beyond the effect of the pleadings and consider any facts brought to its attention or any facts which it could reasonably discover. *Patrons Mutual*, 732 P.2d at 744; *Spruill Motors*, 512 P.2d at 407.

On August 8, 1991, City made a demand on Maryland Casualty for defense and indemnification of the Eisele suit. On August 21, 1991, Charles F. Endres, acting on behalf of Maryland Casualty, rejected City's demand. Mr. Endres based the rejection solely on his belief that the "pollution exclusion" excluded coverage.

Prior to August 21, 1991, Maryland Casualty conducted no investigation of the Ramaco accident. The only information available to Mr. Endres at the time he prepared the August 21, 1991, rejection letter was the following: (1) the demand letter the Eiseles sent to Ramaco; (2) the demand letter the Eiseles sent to City; (3) the facsimile transmissions giving him notice of the claim; and (4) City's August 8, 1991, notice of claim.

The underlying action was brought for damages that fell within the parameters of an unambiguous "pollution exclusion." City argues that Maryland Casualty had a duty to defend because (1) Maryland Casualty based its decision to deny solely on an examination of the pleadings and (2) Judge O'Connor's rulings in the *Westchester Fire* trilogy created *de jure* a potential of liability.

■ City's first argument is unsupported. It is clear from the record that Mr. Endres had before him more than just the Eiseles' petition. Indeed, it is clear that in addition to the petition he had both demand letters sent by the Eiseles, miscellaneous facsimile transmissions, and City's notice of claim. City has pointed to no support for their assertion that Mr. Endres based the denial solely on the Eiseles' petition. Accordingly, the court rejects City's first argument.[9]

■ City's second argument seems to be that the first *Westchester Fire* opinion created *de jure* a "potential of liability." Judge O'Connor's opinion cannot be read fairly to create *de jure* a "potential of liability" in every case involving a "pollution exclusion." Every contract must be read individually according to its own terms and surrounding

---

**9.** City also places great emphasis on Maryland Casualty's failure to investigate independently the Ramaco accident. There is no requirement that an insurer conduct an independent investigation before rejecting an insured's demand for defense. *See MGM, Inc.*, 855 P.2d 77 (holding that there was no duty to defend but earlier noting that "[c]overage was denied based on the petitions, the policy, and the conversations with [insured's employee]. No additional investigation was done").

factual context. Judge O'Connor's opinion merely placed Maryland Casualty on constructive notice that the definition of pollutant may be limited to include only "toxic or particularly harmful material which is recognized as such in industry or by governmental regulators." *Id.* at 1470. The substance at issue here was highly alkaline wastewater which contained sodium hydroxide. It was a pollutant. Indeed, the wastewater clearly fit even the narrow construction given the exclusion in *Westchester Fire.* *See Westchester Fire,* 768 F.Supp. at 1470 (defining a pollutant as a "toxic or particularly harmful material which is recognized as such in industry or by governmental regulators"). Therefore, the court rejects City's second argument.

■ An insurer has no duty to defend an action which is brought "wholly outside any coverage obligations assumed in the policy or when the insurer would have no liability if plaintiff secured a judgment against the insured." *Spruill Motors, Inc.,* 512 P.2d at 406. *See also Security State Bank,* 825 F.Supp. at 946 (quoting *Spruill Motors, Inc.,* 512 P.2d at 406); *Patrons Mutual Ins. Ass'n v. Harmon,* 240 Kan. 707, 732 P.2d 741, 744 (1987). "Where there is no coverage there is no duty to defend." *Patrons Mutual,* 732 P.2d at 744; *Spruill Motors,* 512 P.2d at 406.

In the instant case, the underlying action was brought to recover damages wholly outside any coverage obligation. The "pollution exclusion" is unambiguous and clearly excludes the escape of pollutants such as caustic wastewater. Indeed, even narrowly construing the exclusion, Maryland Casualty still had no potential of liability because the nature of the wastewater was such that it was particularly harmful to the environment. Thus, the court concludes that Maryland Casualty had no duty to defend.

### 3. *Attorneys' Fees Pursuant to K.S.A. 40–256*

■ City argues that, pursuant to K.S.A. 40–256, it is entitled to recover the attorneys' fees it incurred prosecuting the instant action.

In pertinent part, K.S.A. 40–256 provides as follows:

**Attorney fees in actions on insurance policies; exception.** That in all actions hereafter commenced, in which judgment is rendered against any insurance company . . . if it appear from the evidence that such company . . . has refused without just cause or excuse to pay the full amount of such loss, the court in rendering such judgment shall allow the plaintiff a reasonable sum as an attorney's fee for services in such action . . . to be recovered and collected as part of the costs. . . .

■ Whether an insurance company's refusal to pay a claim was without just cause or excuse is a question of fact. *Southgate Bank v. Fidelity & Deposit Co.,* 14 Kan.App.2d 454, 794 P.2d 310, 316 (1990); *Clark Equipment Co. v. Hartford Acc. & Indem.,* 227 Kan. 489, 608 P.2d 903, 907 (1980).

■ If an insurance company's refusal is a frivolous and unfounded denial of liability that is patently without any reasonable foundation, it is "without just cause or excuse." *Clark Equipment Co.,* 608 P.2d at 907 (citing to and quoting from *Koch, Administratrix v. Prudential Ins. Co.,* 205 Kan. 561, 470 P.2d 756 (1970)). *See also Pacific Employers Ins. v. P.B. Hoidale Co.,* 804 F.Supp. 137, 144 (D.Kan.1992) (writing that "[t]he phrase 'without just cause or excuse' means a frivolous and unfounded denial of liability for which there is no bona fide and reasonable ground for refusing to pay").

■ However, if a good faith legal controversy exists as to liability, K.S.A. 40–256 fees must be denied. *Allied Mut. Ins. Co. v. Gordon,* 248 Kan. 715, 811 P.2d 1112, 1125 (1991). Fees also must be denied if there is a bona fide and reasonable factual ground for refusing to pay the claim. *Id.* Thus, a "[d]enial of payment that is not arbitrary, capricious, or in bad faith will not give rise to an award of attorney fees." *Id.*

Maryland Casualty's refusal was based on an application of an unambiguous exclusion. The court finds Maryland Casualty's denial was not frivolous or unfounded. Indeed, the court finds that the unambiguous exclusion constitutes a bona fide and reasonable ground for Maryland Casualty's refusal to pay. Therefore, the court denies City's re-

quest for attorneys' fees under K.S.A. 40–256.

### B. *City's Motion to Review Magistrate's Order*

District of Kansas Local Rule 604(a) states that "[t]he procedure for filing objections to an order of a magistrate judge in a nondispositive matter shall be as set forth in Fed. R.Civ.P. 72(a). Such objections shall be made by filing a motion to review the order in question."

Fed.R.Civ.P. 72(a) provides as follows:

(a) **Nondispositive Matters.** A magistrate judge to whom a pretrial matter not dispositive of a claim or defense of a party is referred to hear and determine shall promptly conduct such proceedings as are required and when appropriate enter into the record a written order setting forth the disposition of the matter. Within 10 days after being served with a copy of the magistrate judge's order, a party may serve and file objections to the order; a party may not thereafter assign as error a defect in the magistrate judge's order to which objection was not timely made. The district judge to whom the case is assigned shall consider such objections and shall modify or set aside any portion of the magistrate judge's order found to be clearly erroneous or contrary to law.

City filed its motion to review Magistrate Judge Newman's Order on November 19, 1993. The challenged Order was filed on November 2, 1993.

The court notes that Fed.R.Civ.P. 72(a) was amended in 1991. In its earlier version, Rule 72(a) provided that the 10–day period began to run upon entry of the order. Under Rule 72(a)'s current version, the 10–day period does not begin to run until the objecting party has been served with the order. The Order was served, apparently by mail, on November 2, 1993. Applying Rule 6(a), and adding three days in accordance with Rule 6(e), City's motion appears timely.

City moves the court to review rulings made by Magistrate Judge Ronald Newman in his November 2, 1993, Memorandum and Order. Specifically, City asks the court to reverse three of Magistrate Judge Newman's rulings and order Maryland Casualty to take the following actions: (1) respond to Interrogatory Numbers 11 and 12; (2) respond to Request for Admission Number 43; and (3) produce eight pages of the Eisele claim material for *in camera* inspection.

The material at issue here relates to City's claim that Maryland Casualty had a duty to defend. Some of the material relates to the reasonableness of the fees paid by City to defend the Eisele litigation. The rest of the material ostensibly relates to whether there was a potential of liability.

Interrogatory Numbers 11 and 12 and Request for Admission Number 43 all deal with the reasonableness of the fees paid by City for its defense. The reasonableness of the fees would have been at issue only if Maryland Casualty was found to have had a duty to defend. The court granted Maryland Casualty summary judgment on the duty to defend claim. Therefore, with regard to Magistrate Judge Newman's rulings on Interrogatory Numbers 11 and 12 and Request for Admission Number 43, the court denies City's motion as moot.

City also requested that the court conduct an *in camera* review of certain items from the Eisele claim file. Magistrate Judge Newman determined that the items were work product. He further determined that City failed to overcome the work product barrier. The court has reviewed City's memoranda and finds City has failed to establish that Magistrate Judge Newman's decision was clearly erroneous or contrary to law. Therefore, with regard to Magistrate Judge Newman's rulings on City's request for *in camera* inspection, the court denies City's motion.

## V. CONCLUSION

**IT IS BY THE COURT THEREFORE ORDERED** that City's motion for summary judgment (Doc. 64) is denied.

**IT IS FURTHER ORDERED** that Maryland Casualty's motion for summary judgment (Doc. 65) is granted.

**IT IS FURTHER ORDERED** that City's motion to review magistrate's order (Doc. 70) is denied as moot and denied.