KINDERGARTNERS COUNT, INC.,
Plaintiff/Counterclaim
Defendant,

v.

Donald F. DEMOULIN,
Defendant/Counterclaim Plaintiff,

and

Telephone Pioneers of America,
and Pioneers Foundation,
Defendants,

v.

Vernie L. Wheeler, Counterclaim
Defendant.

Kindergartners Count, Inc., Plaintiff,

v.

Donald F. Demoulin, and Telephone
Pioneers of America,
Defendants

Nos. 00–4173–JAR, 01–4017–JAR.

United States District Court,
D. Kansas.

March 13, 2003.

Anne M. Kindling, Harold S. Youngentob, Nathan Daniel Leadstrom, Goodell, Stratton, Edmonds & Palmer, Topeka, KS, for Plaintiff.

David R. Barnard, John M. McFarland, Lathrop & Gage L.C., Todd E. Hilton, Stueve Helder Siegel LLP, Kansas City, MO, Evelyn Z. Wilson, J. Phillip Gragson, Wright, Henson, Somers, Sebelius, Clark & Baker, LLP, Topeka, KS, Joseph F. Marinelli, Jenner & Block, Chicago, IL, Kevin James Grauberger, Wright, Henson, Somers, Sebelius, Clark & Baker, LLP, Topeka, KS, Molly J. Moran, Richard P. Steinken, Thomas K. McQueen, Jenner & Block, Chicago, IL, Thomas E. Wright, Wright, Henson, Somers, Sebelius, Clark & Baker, LLP, Brian G. Boos, Gehrt & Roberts, Chartered, Topeka, KS, Topeka, KS, for Defendants.

Vernie L. Wheeler, Topeka, KS, Pro se.

## MEMORANDUM ORDER AND OPINION MODIFYING ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT

ROBINSON, District Judge.

On December 5, 2002, the Court held a hearing on the parties' respective motions, including several motions and cross-motions for summary judgment. The Court ruled that the motions for summary judgment were not in a posture for ruling at

that time and directed the parties to submit agreed statements of threshold legal issues. An Omnibus Order (Doc. 434) was entered on December 16, 2002, denying the majority of the summary judgment issues, subject to the parties' submission of threshold legal issues. Not surprisingly, the parties were only able to agree on two issues, but submitted individual contentions nonetheless. The Court held a second hearing on these matters on February 19, 2003, at which time oral rulings were made and read into the record. For the reasons stated on the record, the Court has reviewed the submissions for any common grounds and finds that several threshold issues of law can be determined on summary judgment. This order supersedes the Omnibus Order entered December 16, 2002.

## I. Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."[1] The requirement of a "genuine" issue of fact means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party.[2] Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

that one party must prevail as a matter of law."[3]

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. This burden may be met by showing that there is a lack of evidence to support the nonmoving party's case.[4] Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact left for trial.[5] "A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."[6] Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.[7] The court must consider the record in the light most favorable to the nonmoving party.[8]

The court notes that summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[9]

## II. Statement of Facts

The following facts are taken from the summary judgment record and are either stipulated, uncontroverted or viewed in the light most favorable to the non-movant's

---

1. Fed.R.Civ.P. 56(c).

2. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

3. *Id.* at 251–52, 106 S.Ct. 2505.

4. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

5. *See Anderson*, 477 U.S. at 256, 106 S.Ct. 2505.

6. *Id.*

7. *See id.*

8. *See Bee v. Greaves*, 744 F.2d 1387, 1396 (10th Cir.1984), *cert. denied* 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985).

9. *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

case. The Court ignores factual assertions that are immaterial, or not supported by affidavits and/or authenticated and admissible documents. The Court also disregards conclusory statements and statements that are conclusions of law rather than statements of fact.

Plaintiff Kindergartners Count, Inc. ("KCI") is the purported copyright owner of "I Like Me!" ("ILM book"), a personalized children's book, and the ILM Teacher's Guide.[10] KCI entered into a Partnership Agreement with Telephone Pioneers of America ("TPA") on January 28, 1998. The Partnership Agreement identifies TPA as a "domestic fraternal society" under IRS 501(c)(10) and KCI as a "nonprofit exempt organization under IRS 501(c)(3)." The primary focus of the partnership was "local TPA units working with schools, and other interested community stakeholders in the United States, Canada and Mexico to distribute KCI's 'I Like Me!' program."

The Partnership Agreement sets forth the respective responsibilities of KCI and TPA:

*All parties mutually agree to:*

1) Work jointly, as resources allow, in promoting the agreement to individuals and/or organizations that can have a positive influence in the program enrollment/distribution of the "I Like Me!" readers to school children and teachers guides for education professionals.

2) Work jointly in publicizing the partnership-issuing press releases and highlighting the TPA and "I Like Me!" *program* in internal and external publications . . . .

3) Work jointly to connect schools and communities by building networks of home/school/community alliances via the "I Like Me!" program.

4) Work jointly to develop and publish an annual partnership communications and promotional activities plan which is reviewed and approved by the leadership of both organizations.

5) Work jointly to develop and keep current a partnership reference guide, training materials, and other partnership promotion materials as resources allow.

6) Work jointly to support the efforts of the local TPA units.

With regard to KCI's role, the Partnership Agreement states:

KCI is the owner and copy right holder of the "I Like Me!" reader and teachers guide. Any "I Like Me!" related product or service created by Pioneers will be approved by KCI prior to promotion or distribution, KCI will be responsible for any content changes to the materials. KCI will be responsible for the development of any new products under the "I Like Me!" program.

The Agreement stated the ultimate goal of the partnership was "to enroll every Kindergartner in the United States and Canada in the "I Like Me!" program which includes distribution of a personalized reader and teacher's guide." The Agreement set out established mutual volume goals, beginning with a goal of 60,000 program enrollments for the 1997–1998 school year, and progressing to a goal of 850,000 program enrollments for the 2001–2002 school year.

The Partnership Agreement was for an initial five (5) year period, renewable for an additional five (5) years, as follows:

The initial partnership agreement will be for a period of five years. Renewal

---

**10.** The validity and extent of KCI's copyright in the "I Like Me!" book is disputed by defendant Donald DeMoulin.

of the agreement will be by mutual consent of the parties and will be for a period of five years. The partnership can be dissolved with written notification of either party to the other within 60 days of July 30 each year.

KCI entered into a series of consulting agreements with Don DeMoulin ("DeMoulin"), a professor of Education at the University of Tennessee–Martin in Jackson, Tennessee ("UTM"). The first written Consulting Agreement was signed on August 19, 1997, and entered on October 1, 1997. There were no written contracts prior to this, but DeMoulin has filed a counterclaim against KCI based on prior oral agreements.

The October 1, 1997 Consulting Agreement provides, in part:

1. DeMoulin will provide educational, training, publication and research consulting services to KCI as they relate to the "I Like Me" program. DeMoulin will make himself available to provide up to 50 presentations to various groups as identified and requested by KCI. In addition, De Moulin will participate in all media interviews as requested by KCI.

2. DeMoulin will develop a 12 week study guide for use by classroom teachers as they implement the "I Like Me" program. KCI will produce and distribute the study guide as part of the "I Like Me" program. DeMoulin shall be responsible for all necessary revisions of the guide as requested by KCI.

On April 11, 1999, DeMoulin entered into a second Consulting Agreement with KCI that superseded the October 1, 1997 Agreement. The 1999 Agreement provided:

The Consultant hereby assigns to KCI any and all right, title and interest in and to the materials created by the Consultant under the prior Consulting Agreement. The Consultant agrees that all materials created for KCI under the prior Consulting Agreement qualify as "work for hire" under 17 U.S.C. 201(b), and thus, all intellectual property rights in and to that material are owned entirely by KCI.

The 1999 Consulting Agreement provided by its terms that it commenced on July 1, 1999 and ended June 30, 2000. The 1999 Consulting Agreement gave KCI rights and interests in matters relating to any part of the program developed by DeMoulin, providing:

6. *Intellectual Property Rights.* Notwithstanding the direct or indirect involvement of the Consultant in the design or development of the "I Like Me" program (the Program), KCI shall retain all right, title, and interest to intellectual property, including, but not limited to, copyright and trademark interests, relating to the Program; and, the Consultant hereby assigns to KCI, without additional consideration, all of the Consultant's right, title and interest in and to the Program and to all proprietary, financial, personal, copyright, trademark or any other intellectual property rights therein or based thereon. The Consultant agrees that, any development of the Program by the Consultant under this Agreement qualifies as a "work for hire" under 17 U.S.C. § 201(b), and thus KCI shall have the exclusive ownership of all rights in the Program and all other related elements....

The 1999 Agreement had a confidentiality provision as follows:

4. *Confidentiality.* Both during the term of this Agreement and after its termination, the Consultant shall hold in confidence all information

obtained in the course of providing consulting services hereunder, and shall not disclose that information to any third party unless authorized or directed to do so by KCI in writing.

The contractual relationship was stated as follows:

9. *Contractual Relationship.* It is expressly acknowledged by the parties that the Consultant is an independent contractor and that nothing contained herein is intended or shall be construed to create an employer-employee relationship between KCI and the Consultant. . . .

Jack Sawka became Executive Director of TPA in 1996. Jim Gadd took over this position on July 1, 1999. Irene Chavira was Vice President of TPA on May 13, 1999. She went on to become President of TPA in June 1999 and held office until June 2000.

In November 1998, Sawka and Vern and Carol Wheeler discussed TPA's purchase of KCI. At that time, DeMoulin was negotiating renewal of his consulting contract with KCI. It is disputed whether Jack Sawka was aware of DeMoulin's contract with KCI and whether DeMoulin sent the April 1999 Agreement to Sawka. Discussions were not successful.

In April 1999, DeMoulin and Sawka attended what DeMoulin referred to as a "planning retreat." TPA solicited a written proposal from DeMoulin for creation of a TPA owned personalized reader program. DeMoulin proposed a 12–page personalized reader that would include dolch sight words and words appropriate for kindergartners, a teacher's guide, a parent's guide, and research to support the program as well as publications, speaking engagements, and the like. A timetable was proposed to implement the program in the schools for the 2000–2001 school year.

In a document prepared for TPA Strategic Planning dated April 27, 1999, Sawka outlined various options for TPA, including the potential development of a TPA owned personalized reader. The document stated the potential for "significant future TPA/Foundation revenue generation."

On May 13, 1999, both Sawka's "options" for a personalized reader and DeMoulin's proposal were presented at a TPA strategic planning meeting in Denver. The Wheelers were not informed of the proposal or presentations. DeMoulin proposed a new personalized reader and program called "A Book About Me" (ABAM). Later that day, at an Executive Committee Meeting of TPA, Ms. Chavira moved to dissolve the Partnership Agreement with KCI. Ms. Chavira testified that at the time, she knew DeMoulin did work for KCI, such as producing materials and research. Mr. Gadd testified that at the time he knew that the book developed by DeMoulin for TPA was similar to the TPA owned book being proposed.

On May 14, 1999, Sawka sent a letter to Wheeler advising of TPA's intention to terminate the partnership, which stated, in relevant part:

Please accept this as formal notice of the intent of the TPA to dissolve the Partnership between TPA and KCI pursuant to article VII of the Partnership Agreement.

We intend to reconfirm this notice during the month of June, 1999.

The production problems, delivery intervals and recent discussion with your managers regarding intended price increases have led us to conclude that if the TPA decides to continue to do business with KCI, it should be in a different format.

We intend to continue our dialogue with you on the aforementioned issues.

On May 11, 1999, Sawka resigned from the Advisory Board of KCI. DeMoulin resigned from KCI's Advisory Board on May 26, 1999.

A TPA Association Executive Committee and Advisory Board Meeting was held in Denver on June 16, 1999, in part to consider the development of TPA's own personalized reader. Sawka commented that they were "looking at whether we will have our own book." On the second day of the meeting, there was discussion of the specifics, including DeMoulin's timeline.

DeMoulin never advised KCI of his contractual proposals or dealings with TPA. In a letter dated June 18, 1999, DeMoulin advised KCI of his intent to terminate his 1999 Consulting Agreement, except for portions that pertained to payments to him. On July 1, 1999, DeMoulin requested to keep his Consulting Agreement with KCI in place, stating that he had acted on bad advice from his lawyer, who was an "idiot." DeMoulin subsequently executed a Contract Agreement with TPA on July 21, 1999, wherein he agreed to "research and develop a complete personalized reader program for kindergarten children specifically for the TPA to include a personalized Reader, a Curriculum Planner for Teachers, Parent's Guide, Research, Summaries and Modifications."

Ms. Chavira put together a business case to assess TPA's options from June 1999 to February 2000. It appears she sought to obtain information from KCI about funding and donors. Ms. Chavira provided the proposed ABAM reader to focus groups to obtain their feedback. Ms. Chavira required the focus groups to maintain the confidentiality of the study and directed that all the reviewed books be destroyed. Ms. Chavira's business plan included a projection for profits and losses.

After the Partnership Agreement was terminated, KCI and TPA entered into a Service Agreement for the period of August 5, 1999 through June 30, 2000, with an option to renew. The Service Agreement was characterized as a "customer-vendor/supplier relationship," with TPA as the customer and KCI as the vendor/supplier. Under the Service Agreement, KCI continued to provide ILM books and teacher's guides to TPA for the 1999–2000 school year.

No one from KCI was advised of the TPA owned personalized reader until it was approved by TPA in February 2000.

## III. Analysis

### A. Applicable partnership law

█ The parties go to great lengths debating whether the Revised Uniform Partnership Act (RUPA) applies to this case. Kansas adopted the Uniform Partnership Act (UPA), K.S.A. 56–301 et seq. (1972), which defines partnership as "an association of two or more persons to carry on as co-owners of a business for profit."[11] RUPA was adopted in Kansas effective January 1, 1999.[12] RUPA modernized the UPA to reflect changes in law and businesses, adding many new concepts and provisions.[13] Traditionally, partners have been held to occupy a fiduciary relationship with respect to their copartners and the firm.[14] This status and one facet of the fiduciary duty of loyalty were codified in the UPA.[15] In a significant change, RUPA codifies partners' fiduciary duties of care and loyalty, and declares them to be

11. K.S.A. 56–306 (1972).

12. K.S.A. 56a–101 et seq. (1999).

13. Hecker, *The Kansas Revised Uniform Partnership Act,* 68 Oct. J. Kan. B.A. 16, 17 (1999).

14. *Id.* at 31.

15. K.S.A. 56–321 (repealed 1999). This section provided that a partner must account to the partnership for any benefit, and hold as trustee any profit, derived without consent of the other partners from any transaction connected with formation, conduct, or liquidation of the partnership, or from use by the partner of partnership property.

exclusive.[16] It also codifies an obligation of good faith and fair dealing, which it structurally characterizes as a nonfiduciary duty.[17] Thus, application of RUPA to this case would appear to benefit both KCI's contract and fiduciary claims against TPA.

In arguing their respective positions on the applicability of RUPA to this case, both parties overlook the fact that the Partnership Agreement was executed in January 1998, before RUPA's effective date of July 1, 1999. RUPA specifically provides that the Act governs only partnerships formed after the July 1, 1999 effective date, unless the partnership is continuing the business of a dissolved partnership.[18] If a partnership was formed before the effective date, RUPA applies only if the partnership voluntarily elects, by amending the partnership agreement, to be governed by the Act.[19] Because the Partnership Agreement was formed in January 1998 and terminated July 30, 1999, without an amendment to elect to be governed by RUPA, the Act does not apply to this case as a matter of law. Accordingly, even if a partnership was created by the Partnership Agreement, KCI cannot utilize RUPA to establish a fiduciary duty or an obligation of good faith and fair dealing.

### B. Count V: TPA and the Foundation breach of contract

The parties agree that Kansas contractual interpretation law applies. The construction and effect of contracts "is a question of law to be determined by the court."[20] The interpretation of an unambiguous contract is a judicial function.[21] If the language of the contract is ambiguous, however, evidence is admissible to determine the intent of the parties to the contract, which is an issue of fact.[22] Whether or not the language of a contract is ambiguous is a question of law for the court to resolve.[23]

To be ambiguous, the contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from the natural and reasonable interpretation of its language.[24] An ambiguity does not appear until application of pertinent rules of interpretation to the face of the instrument leaves it generally uncertain which one of two or more meanings is the proper meaning.[25] A written contract is not ambiguous unless two or more meanings can be construed from the contract provisions themselves.[26] Contracts

16. K.S.A. 56a–404(a)–(c) (1999).

17. K.S.A. 56a–404 (a), (d) (1999).

18. K.S.A. 56a–1304(a)(1) (1999).

19. K.S.A. 56a–1304(a)(2).

20. *First Hays Banshares, Inc. v. Kansas Bankers Sur. Co.*, 244 Kan. 576, 586, 769 P.2d 1184 (1989).

21. *Missouri Pacific R.Co. v. Kansas Gas and Elec. Co.*, 862 F.2d 796, 799 (10th Cir.1988) (applying Kansas law).

22. *See Wood River Pipeline Co. v. Willbros Energy Services Co.*, 241 Kan. 580, 738 P.2d 866, 869 (1987) (quoting *Hall v. Mullen*, 234 Kan. 1031, 678 P.2d 169 (1984)).

23. *Carland v. Metropolitan Life Ins. Co.*, 935 F.2d 1114, 1120 (10th Cir.), *cert. denied* 502 U.S. 1020, 112 S.Ct. 670, 116 L.Ed.2d 761 (1991) (applying Kansas law); *Simon v. National Farmers Organization, Inc.*, 250 Kan. 676, 829 P.2d 884, 888 (1992).

24. *Brumley v. Lee*, 265 Kan. 810, 813, 963 P.2d 1224 (1998).

25. *Hart v. Sprint Communications Co., L.P.*, 872 F.Supp. 848, 854 (D.Kan.1994); *Allied Mutual Insurance Co., v. Moeder*, 48 P.3d 1, 4 (2002).

26. *Albers v. Nelson*, 248 Kan. 575, 578, 809 P.2d 1194 (1991).

drafted by one of the parties should be strictly construed against the party that drafted it and that ambiguous language should be construed liberally toward the nondrafting party.[27]

The court's job is to use common sense and not to strain to create an ambiguity in a written instrument when one does not exist.[28] The fact that the parties do not agree over the meaning of terms does not in and of itself prove that the contract is ambiguous.[29]

### 1. Termination clause

The termination provision of the Partnership Agreement states: "The partnership can be dissolved with written notification of either party to the other within 60 written days of July 30 each year." The parties raise two issues relative to this clause: 1) is there an ambiguity regarding the termination date; and 2) is the clause ambiguous as to whether termination could be done without cause.

The Court previously ruled at the December 5, 2002, hearing that there was no ambiguity regarding the termination date, which the Court concluded was July 30, 2002. The Court is thus left to determine whether, pursuant to the terms of the termination clause, TPA could terminate the Partnership Agreement without cause. The termination clause gives either party the right to terminate the agreement. The only contingency is 60 days written notice within July 30 of each year; there is no express requirement of cause to terminate. The Court finds that the termination clause includes an unambiguous reservation by both parties of discretion to terminate the agreement.[30]

### 2. Good faith and fair dealing

The Court previously held that KCI cannot use RUPA to establish a statutory duty of good faith and fair dealing against TPA. Accordingly, KCI must rely on its theory of implied good faith and fair dealing, which Kansas courts have followed the trend of implying in almost every contract.[31] The purpose of the good faith doctrine in contract law is to protect the reasonable expectations of the parties by implying terms in the agreement.[32] The implied covenant is derivative in nature in that it does not create or supply new contract terms, but it grows out of existing ones.[33] The covenant guides the construction of explicit terms in an agreement. The concept of good faith becomes irrelevant in the interpretation of a contractual provision which grants "uncontrolled discretion" to one of the parties.[34] Because the termination clause gave the parties the right to terminate the Partnership Agreement without cause, KCI is precluded from contending that it had a reasonable expec-

**27.** *See Thomas v. Thomas,* 250 Kan. 235, 244, 824 P.2d 971 (1992).

**28.** *Eggleston v. State Farm Mut. Auto. Ins. Co.,* 21 Kan.App.2d 573, 574, 906 P.2d 661, *rev. denied* 257 Kan. 1091 (1995).

**29.** *Ryco Packaging Corp. v. Chapelle Intern., Ltd.,* 23 Kan.App.2d 30, 36, 926 P.2d 669 (1996), *rev. denied* 261 Kan. 1086 (1997).

**30.** KCI attaches the affidavit of Vern Wheeler stating that it was his understanding that the Partnership Agreement could only be terminated for cause in order to secure the long term nature of the parties' relationship. Such evidence is inadmissible given the Court's finding that the termination clause is unambiguous.

**31.** *Bonanza, Inc. v. McLean,* 242 Kan. 209, 747 P.2d 792 (1987).

**32.** *Flight Concepts Ltd. Partnership v. Boeing Co.,* 819 F.Supp. 1535, 1550 (D.Kan.1993) (citing *Big Horn Coal Co. v. Commonwealth Edison Co.,* 852 F.2d 1259, 1267 (10th Cir. 1988)).

**33.** *Id.*

**34.** *Id.* at 1550–51.

tation of any implied protection with respect to termination. The concept of good faith became irrelevant on this matter.

▮ However, the Court does not extend this irrelevance beyond the termination clause. The Court agrees with KCI that the implied duty of good faith and fair dealing remains in effect to the remaining provisions of the contract, including performance.[35] KCI contends that TPA breached its implied duty by "secretly" developing the ABAM program and contracting with DeMoulin prior to termination of the Partnership Agreement. The question of whether TPA breached this implied duty of good faith and fair dealing remains a question of fact for the jury.

### 3. "Related product" provision

▮ "Article II–Responsibilities of the Parties" contains the following provision relative to the role of KCI:

KCI is the owner and copy right holder of the "I Like Me!" reader and teachers guide. Any "I Like Me!" related product or service created by Pioneers will be approved by KCI prior to promotion or distribution. KCI will be responsible for any content changes to the materials. KCI will be responsible for the development of any new products under the "I Like Me!" program.

KCI contends that TPA breached its express and implied obligations by developing and promoting a competing product which was "related" to the ILM program

without informing KCI of its intentions and efforts or seeking KCI's consent as required by the Partnership Agreement. TPA disputes that the ABAM book and curriculum guide were "related" to the ILM program. Even if it were, TPA argues that the Partnership Agreement merely required any ILM "related" product or service created by TPA to be approved by KCI prior to promotion or distribution. Since the ABAM program was only in the development stage at the time the Partnership Agreement was terminated, there was no breach.

The parties have asked the Court to determine, as a threshold legal issue, whether the "related product" provision of the Partnership Agreement is unambiguous and, if so to determine whether the ABAM program was a "related product or service" to the ILM program and at what step KCI's approval was required.

▮ The Partnership Agreement does not define "related product or services," nor do the parties. The fact that a contract does not define each term used within it does not somehow make the undefined term ambiguous.[36] The court must take unambiguous language in its plain, ordinary and popular sense.[37] Ambiguity arises only if the language at issue is subject to two or more reasonable interpretations and its proper meaning is uncertain.[38]

Black's Law Dictionary defines "related" as "[s]tanding in relation; connected; allied; akin."[39] It defines "related good" as

---

**35.** See *St. Catherine Hosp. of Garden City v. Rodriguez,* 25 Kan.App.2d 763, 766, 971 P.2d 754 (1998).

**36.** See *Home Indem. Co. v. Hyplains Beef, L.C.,* 893 F.Supp. 987, 991 (D.Kan.1995) (citation omitted).

**37.** *Id.* (citing *City of Salina, Kan. v. Maryland Cas. Co.,* 856 F.Supp. 1467, 1475 (D.Kan. 1994)).

**38.** *Id.* (citing *Security State Bank of Kansas City v. Aetna Cas. & Sur. Co.,* 825 F.Supp. 944, 946 (D.Kan.1993)).

**39.** Black's Law Dictionary 1158 (6th ed.1990).

it pertains to trademarks as: "[a] good that infringes a trademark because it appears to come from the same source as the marked good, despite not competing with the marked good."[40] The word "related" appears to have a generally accepted meaning which may or may not be the same when considered in conjunction with the phrase "related product," which does not appear to have a settled legal signification. The Court finds that the proper meaning of "related product" as used in the Partnership Agreement is uncertain and thus ambiguous. For this reason, evidence is admissible to determine the intent of the parties regarding this phrase, which is a question of fact. It follows that whether the ABAM program was a "related product" of ILM is also a question of disputed fact.

The Court finds the remainder of the phrase at issue is also ambiguous-if the ABAM program was a related product of the ILM program, KCI's approval was required at the promotion or distribution stage of creation. TPA argues that because the ABAM program was only in the development stage at the time the Partnership Agreement was terminated, there was no breach. However, the provision at issue continues to state that KCI will be responsible for "development of any new products." The Court finds that there are issues of material fact concerning TPA's progress and intent with respect to the program to preclude summary judgment on this issue.

### 4. "Failure to distribute" theory

■■■ TPA raises the threshold issue of whether KCI waived its "failure to distribute" breach of contract theory by failing to include it in the Pretrial Order. TPA re-

fers to this as KCI's "constantly mutating claim of breach of contract," arguing that although this ground for breach was alleged in the fourth amended complaint, it was abandoned at the pretrial conference in favor of the "secret development" theory, over TPA's objection. The Court notes that KCI did not raise this issue in its motion for summary judgment, but only in passing in its reply memorandum.

KCI does not include TPA's alleged failure to distribute in its issues of fact set forth in the Pretrial Order. However, TPA includes the issue in its affirmative defenses (Pretrial Order p. 69), alleging that KCI waived this cause of action by entering into the Service Agreement with knowledge that TPA had not met the distribution goals. TPA contends that it included this defense because it was unaware that KCI was going to shift the focus of its theory from failure to distribute to TPA's hiring of DeMoulin.

■■■ Claims, issues, defenses or theories of damages not included in the pretrial order are waived even if they appeared in the complaint and, conversely, the inclusion of a claim in the pretrial order is deemed to amend any previous pleadings which did not include that claim.[41] In dealing with an ambiguous pretrial order such as this, the Court must evaluate the order contextually to determine whether the claim was contained therein.[42] In this case, the clear language of the fourth amended complaint, coupled with the ambiguous language of the pretrial order, leads the Court to conclude that there was insufficient documentary support for the allegation of a claim of breach of contract for failure to meet dis-

---

**40.** *Id.* at 1291 (7th ed.1999).

**41.** *Wilson v. Muckala,* 303 F.3d 1207, 1215 (10th Cir.2002).

**42.** *Id.*

tribution requirements. Summary judgment is granted on this issue.

### C. Count VIII–TPA/Foundation breach of fiduciary duty

KCI's breach of fiduciary duty claim against TPA hinges on what type of business association the parties had. If the relationship was a partnership, KCI contends that a fiduciary duty relationship would be inherent to the partnership, either under common law or RUPA. If the relationship was not a partnership, but rather a nonprofit association, as alleged by TPA, then any fiduciary duty would be implied and determined according to common law factors. TPA further argues that even if a partnership existed, RUPA does not apply because it was not a partnership as defined by that Act. The Court has previously held that RUPA does not apply to this case.

#### 1. Existence of a partnership.

 As stated above, the UPA defines partnership as "an association of two or more persons to carry on as co-owners a business for profit."[43] There are no filing or creation requirements. Rather, the parties' intentions, the terms of their agreement and the manner in which they carry out their business determines their status.[44]

 Kansas courts use a number of tests in determining the existence of a partnership. No one factor or test is conclusive. Factors include: the parties' intentions; sharing of profits, losses and expenses; joint control of management; joint ownership of assets; and active participation in management.[45]

 Where, as in this case, a partnership agreement exists, the court must look first to such agreement as the expression of the parties' intent and may not look to extrinsic evidence of parties' intent unless a contract provision is found to be ambiguous. The key factor is not the subjective intent of the parties to form a partnership, but instead the intent of the parties to do things that the law would consider a partnership. Although the manner in which parties themselves characterize a relationship is probative to the issue of whether a partnership exists, the ultimate question is whether the parties intended to do acts that in law constitute a partnership.

In this case, although the parties characterized their relationship as a partnership, it does not appear that they intended to do acts that in law constitute a partnership. KCI characterizes the relationship as a "product/service partnership, in which KCI supplied the product (the "I Like Me!" program and related materials) and TPA provided the services in helping to promote, publicize and distribute the product." However, there appears to be no joint ownership of property or sharing of profits. KCI clearly contends that it is the owner of the ILM program, both expressly in the Partnership Agreement and by virtue of its copyright infringement claim. Further, there does not appear to be any sharing of profits-TPA purchased the ILM books from KCI, which it distributed to schools at no cost as part of its volunteer efforts. KCI makes much of TPA's discussion of potential profits to be made for TPA and the Foundation. However, this was in the context of TPA developing its *own* personalized reader program, to real-

---

43. K.S.A. 56–306(a).

44. *In re Johnson,* 19 B.R. 371, 374 (Bkrtcy. D.Kan.1982) (citing *Grimm v. Pallesen,* 215

Kan. 660, 527 P.2d 978 (1974)) (citing *Potts v. Lux,* 161 Kan. 217, 166 P.2d 694 (1946)).

45. *Id.*

ize a profit that was not shared by KCI, the owner of the ILM program. KCI argues that the profit motive of the parties should be left for the jury to decide. The Court finds that the Partnership Agreement is ambiguous as to the parties' intent to form a partnership and will allow evidence on this issue.

## 2. Fiduciary relationship

 There are two types of fiduciary relationships under Kansas law: (1) those specifically created by contract or formal legal proceedings, and (2) those implied in law due to the factual situation surrounding the involved transactions and the relationship of the parties to each other and to the questioned transactions.[46] The Court previously upheld the Magistrate Judge's order striking KCI's joint venture and agent theories from the Pretrial order.

### a. Created by partnership

 The Court has previously ruled that the specific exclusive fiduciary duties imposed by RUPA do not apply to this case. The issue thus becomes whether a fiduciary duty is inherent to a partnership agreement under the UPA or common law. As noted above, a general partner's duty of loyalty had a statutory basis under the UPA.[47] This duty was nonexclusive. Thus, a partner's duty of loyalty inhibits him or her from engaging in self-dealing transactions with the partnership, using partnership property or information for personal benefit, usurping partnership business opportunities, or competing with the partnership. Thus, if a partnership existed, the duty of loyalty is inherent to the relationship. This remains an issue of material fact precluding summary judgment.

### b. Implied fiduciary relationship

If there was no partnership, KCI claims in the alternative that TPA breached its implied fiduciary duty. "The Supreme Court of Kansas has cautioned against an approach which would unfairly 'convert day-to-day business transactions into fiduciary relationships where none were intended or anticipated.'"[48] An implied fiduciary relationship was described by the *Denison State Bank* court as follows:

A fiduciary relationship imparts a position of peculiar confidence placed by one individual in another. A fiduciary is a person with a duty to act primarily for the benefit of another. A fiduciary is in a position to have and exercise, and does have and exercise influence over another. A fiduciary relationship implies a condition of superiority of one of the parties over the other. Generally, in a fiduciary relationship, the property, interest or authority of the other is placed in the charge of the fiduciary.[49]

 A party seeking to establish the existence of a fiduciary relationship must prove it by clear and convincing evidence.[50] The "conscious assumption of the alleged fiduciary duty is a mandatory element under Kansas law."[51] The Court finds that material issues of fact remain in dispute precluding entry of summary judgment.

**46.** *Denison State Bank v. Madeira*, 230 Kan. 684, 691, 230 Kan. 815, 640 P.2d 1235, 1241 (1982).

**47.** K.S.A. 56–321 (repealed 1999).

**48.** *Rajala v. Allied Corp.*, 919 F.2d 610, 615 (10th Cir.1990) (quoting *Denison State Bank*, 230 Kan. at 696, 640 P.2d 1235).

**49.** *Denison State Bank*, 230 Kan. at 692, 230 Kan. 815, 640 P.2d 1235.

**50.** *Rajala*, 919 F.2d at 616–16 (citing *Wolf v. Brungardt*, 215 Kan. 272, 284–85, 524 P.2d 726, 736 (1974)).

**51.** *Id.* at 615.

### D. Count IV: DeMoulin breach of contract

KCI contends that DeMoulin breached his agreements with KCI by failing to act in good faith and fair dealing, failing to maintain confidentiality of information provided to him by KCI, secretly developing and promoting the competing ABAM program which is related to and based upon KCI's ILM program, purportedly assigning his interest in ABAM after previously promising to assign such rights to KCI, and failing to promote KCI's ILM program. The essence of the breach of contract stems from DeMoulin's wrongful actions in secretly developing and promoting the ABAM program and handing it over to TPA rather than to KCI as required by the April 11, 1999 Consulting Agreement.

The relevant provisions of the April 11, 1999 agreement provide:

4. *Confidentiality.* Both during the term of this Agreement and after its termination, the Consultant shall hold in confidence all information obtained in the course of providing consulting services hereunder, and shall not disclose that information to any third party unless authorized or directed to do so by KCI in writing.

6. *Intellectual Property Rights.* Notwithstanding the direct or indirect involvement of the Consultant in the design or development of the "I Like Me" program (the Program), KCI shall retain all right, title, and interest to intellectual property, including, but not limited to, copyright and trademark interests, relating to the Program; and, the Consultant hereby assigns to KCI, without additional consideration, all of the Consultant's right, title and interest in and to the [I Like Me!] Program and to all proprietary, financial, personal, copyright, trademark or any other intellectual property rights therein or based thereon. The Consultant agrees

that, any development of the Program by the Consultant under this Agreement qualifies as a 'work for hire' under 17 U.S.C. § 201(b), and thus KCI shall have the exclusive ownership of all rights in the Program and all other related elements....

KCI contends that, while under this contract with KCI, DeMoulin proposed to develop a competing personalized reading program, ABAM, that was based upon and related to the ILM program for TPA. Then, while the Consulting Agreement with KCI was in effect, DeMoulin signed an agreement with TPA on July 21, 1999, to produce the ABAM program for TPA. KCI argues that any interest DeMoulin had in the ABAM program had been previously assigned to KCI under the April 11, 1999 agreement. This also constituted "work for hire" which belonged to KCI. KCI contends that DeMoulin also breached the confidentiality provision of the consulting agreement and failed to promote KCI's program.

DeMoulin responds that KCI's interpretation of the phrases "based thereon" and "related elements" overreach the unambiguous provisions of the 1999 agreement. DeMoulin argues that his agreement to assign his rights in work he did on the ILM program, "related elements" and other intellectual property rights "based thereon" to KCI is directed solely at DeMoulin's work on the KCI project, and not work for other entities such as TPA. DeMoulin argues that KCI's interpretation of the phrases claims it owns any and all work that he did of *any* sort on *any* personalized reader or teacher's guide for any party, and inflates the phrases into a noncompete clause, which does not exist in the agreement, which KCI drafted. DeMoulin further argues that for nonemployees like DeMoulin (an independent contractor), the "work for hire" provision of the Copyright

Act, 17 U.S.C. § 201(b), is specifically limited in scope to work directly prepared for the employer or commissioning entity. Since DeMoulin's work on ABAM was not commissioned by KCI, it falls outside the statutory scope of "work made for hire."

DeMoulin's cross-motion focuses on KCI's claim that DeMoulin used or disclosed confidential information belonging to KCI and then failed to assign KCI his interest in the ABAM book and curriculum planner. DeMoulin argues that any and all research and/or work he produced for KCI was published or distributed and was not confidential. The only support KCI offers is the deposition testimony of Terri Buek and Carol Wheeler, which DeMoulin contends is self-serving. DeMoulin argues that KCI is attempting after the fact to impose a noncompete provision in their agreement, which is dispositive of the breach of contract claim.

### 1. Good faith and fair dealing.

DeMoulin raises as a threshold issue whether KCI preserved in the Pretrial Order any claim for breach of the implied covenant of good faith and fair dealing. Kansas courts have followed the trend of implying the covenant of good faith and fair dealing to almost every contract.[52] Section IV.(3)(b) of the Pretrial Order sets forth the following issue of law: Do agreements made in Kansas incorporate the requirements of good faith and fair dealing. Thus, the issue has been preserved.

### 2. Is Section 6 unambiguous?

KCI contends that the phrases "any other intellectual property rights therein or based thereon" as well as "and all other related elements" are unambiguous, and construes this language to include the ABAM book and Curriculum Planner. DeMoulin argues that the phrases are directed solely at his work on the ILM program, not other work for other entities such as TPA. The Agreement does not define the terms "based thereon" or "related elements," nor do the parties.

In order to determine the meaning of these phrases, the Court must look at the Consulting Agreement as a whole, in particular the provision under Section 1 that:

> all materials created for KCI under the prior Consulting Agreement qualify as "work for hire" under 17 U.S.C. § 201(b), and thus, all intellectual property rights in and to that material are owned entirely by KCI.

17 U.S.C.A. § 101 provides:

> A "work made for hire" is-
>
> (1) a work prepared by an employee within the scope of his or her employment; or
>
> (2) a work specially ordered or commissioned for use as a contribution to a collective work, as a part of a motion picture or other audiovisual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire. For the purpose of the foregoing sentence, a "supplementary work" is a work prepared for publication as a secondary adjunct to a work by another author for the purpose of introducing, concluding, illustrating, explaining, revising, commenting upon, or assisting in the use of the other work, such as forewords, afterwords, pictorial illustrations, maps, charts, tables, editorial notes, musical arrangements, answer material for tests, bibliographies, appendixes, and indexes, and an "instructional text" is a literary, pictorial, or graphic work prepared for publication and with

---

52. *Bonanza, Inc. v. McLean*, 242 Kan. 209, 747 P.2d 792 (1987).

the purpose of use in systematic instructional activities.

Thus, DeMoulin was hired as an independent contractor to provide "supplementary work" on the ILM program by creating the ILM Teacher's Guide. This work was "specially ordered or commissioned." Thus, the scope of KCI's assignment would appear to extend only to the work commissioned for the ILM program; the ABAM program was specially commissioned by TPA.

However, reading Section 6 as a whole, the complete phrase KCI relies upon reads "any other intellectual property rights therein or based thereon." As conceded by DeMoulin, this phrase is "no broader or less broad than KCI's claim of copyright infringement of the I Like Me book and teacher's guide." If KCI is successful in its copyright infringement claim, which has survived summary judgment, would DeMoulin's assignment extend to the infringing ABAM works? If the ABAM works are infringing works, are they related to or based upon the ILM works? The Court finds Section 6 is ambiguous and will allow evidence to determine the intent of the parties with respect to these phrases, which is a question of fact. Summary judgment is precluded on this issue.

### 3. Confidentiality clause

DeMoulin focuses on KCI's claim that DeMoulin used or disclosed confidential information belonging to KCI and then failed to assign KCI his interest in the ABAM book and curriculum planner. DeMoulin argues that any and all research and/or work he produced for KCI was published or distributed and was thus not confidential. DeMoulin argues that KCI is attempting after the fact to impose a noncompete provision in the agreement, which

he contends is dispositive of the breach of contract claim.

The Court finds that this is a mixed issue of law and disputed material fact precluding summary judgment at this time.

### E. Count VII: DeMoulin breach of fiduciary duty

There are two types of fiduciary relationships under Kansas law: (1) those specifically created by contract or formal legal proceedings, and (2) those implied in law due to the factual situation surrounding the involved transactions and the relationship of the parties to each other and to the questioned transactions.[53] KCI contends that the 1999 Consulting Agreement creates an express agency relationship between KCI and DeMoulin. KCI focuses on the language in the agreement that DeMoulin would "represent" KCI at various functions and educational conferences as well as make presentations, publish articles, participate in media interviews and update the ILM program. DeMoulin counters that the written agreements specifically state that DeMoulin was an independent contractor, and thus he owed KCI no express fiduciary duties under the agreement.

Although the 1999 Consulting Agreement specifically states that DeMoulin is an independent contractor and not an employee of KCI, it is silent on whether he is an agent. DeMoulin does not cite any authority that an independent contractor is precluded from being an agent. The relationship of agency may be expressly created or arise by inference from the relation of the parties without proof of any express agreement, or may be created by law.[54] Whether one is the express agent of anoth-

**53.** *Denison State Bank,* 230 Kan. at 691, 230 Kan. 815, 640 P.2d 1235.

**54.** *Appeal of Scholastic Book Clubs, Inc.,* 260 Kan. 528, 540, 920 P.2d 947 (1996).

er for a specific purpose depends upon whether he or she has a power to act with reference to the subject matter.[55] To establish an agency relationship, there need be no evidence of authority to act if the party performs duties or creates benefits of which the other person avails himself or herself.[56]

 While an express contract may create an agency relationship, conduct implying an agency relationship serves just as well.[57] An implied agency may exist if it appears from the parties' words, conduct, or other circumstances that the principal intended to give the agent authority to act.[58] An implied agency relationship may exist notwithstanding either a denial of the agency by the alleged principal or a lack of mutual understanding of agency between the parties.[59]

The Court finds sufficient material disputed facts to preclude summary judgment on the issue of whether the 1999 Consulting Agreement created an agency relationship between DeMoulin and KCI. Although not raised in the summary judgment pleadings, the Court notes that KCI also raised the issue of implied fiduciary relationship, which is also a question for the jury.

### F. Counterclaim Count I: Defamation

 DeMoulin counterclaims against Wheeler and KCI for defamation based on Wheeler's statements to DeMoulin's boss that DeMoulin was a plagiarist. The Court previously granted DeMoulin's motion for summary judgment on Wheeler's "public figure" and "common interest" affirmative defenses. Wheeler and KCI also allege truth as an affirmative defense. Both DeMoulin and KCI ask the Court to determine as a threshold legal issue whether "plagiarism" is different from "copyright infringement." DeMoulin contends that claims of copyright infringement and plagiarism are legal equivalents such that a finding of no copyright infringement, as a matter of law, means that no plagiarism occurred.

While the cases cited by DeMoulin stand for the proposition that legal claims of plagiarism, found under some state laws, are preempted by the Copyright Act, it does not follow that plagiarism, in the nonlegal sense, is identical to copyright infringement. Black's Law Dictionary defines plagiarism as "[t]he act or an instance of copying or stealing another's words or ideas and attributing them as one's own."[60] By contrast, and as discussed in great detail in the Court's Memorandum and Opinion regarding KCI's copyright infringement claim (Doc. 452), the Copyright Act applies to expression, not ideas.[61] Black's sheds further light on the confusion between the two terms:

> Plagiarism, which many people commonly think has to do with copyright, is not in fact a legal doctrine. True plagiarism is an ethical, not a legal offense and is enforceable by academic authorities, not courts. Plagiarism occurs when someone-a hurried student, a neglectful professor, an unscrupulous writer-falsely claims someone else's words, whether copyrighted or not, as his own. Of

---

55. *Id.*

56. *Id.* (citing *Kunz,* 124 F.2d at 913).

57. *Id.*

58. *Id.* (citing *Turner and Boisseau, Chtd. v. Marshall Adjusting Corp.,* 775 F.Supp. 372, 378 (D.Kan.1991)).

59. *Id.*

60. *Black's Law Dictionary* 1170 (7th ed.1999).

61. 17 U.S.C. § 102(b).

course, if the plagiarized work is protected by copyright, the unauthorized reproduction is also a copyright infringement.[62]

Accordingly, the Court finds that a finding of plagiarism is not contingent upon a finding of copyright infringement. The truth of Wheeler's alleged defamatory statement remains a disputed issue of material fact for the jury.

**IT IS THEREFORE ORDERED BY THE COURT** that:

1) KCI's motion for summary judgment (Doc. 322) is partially GRANTED with respect to Count V regarding the termination clause of the Partnership Agreement and DENIED as to all remaining counts and threshold legal issues;

2) TPA's motion for summary judgment (Doc. 347) is GRANTED with respect to the applicability of RUPA to the Partnership Agreement and waiver of KCI's failure to distribute theory and DENIED as to all remaining counts and threshold legal issues; and

3) With respect to the threshold legal issue regarding DeMoulin's defamation counterclaim, plagiarism is not contingent upon a finding of copyright infringement.

**IT IS FURTHER ORDERED** that this order supercedes the Omnibus Order entered December 16, 2002.

IT IS SO ORDERED.

---

**62.** *Black's Law Dictionary* 1170 (7th ed.1999) (quoting Paul Goldstein, *Copyright's Highway* 12 (1994)).