**DODSON INTERNATIONAL PARTS, INC., Respondent,**

v.

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURG PENNSYLVANIA, et al., Appellant.**

**No. WD 71893.**

Missouri Court of Appeals, Western District.

Nov. 30, 2010.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 1, 2011.

Application for Transfer Denied March 29, 2011.

Kirk R. Presley and Kana R. Lydick, Kansas City, MO, for respondent.

John W. Cowden, David M. Eisenberg and Jarod G. Goff, Kansas City, MO, for appellant.

Before Division Three: ALOK AHUJA, Presiding Judge, VICTOR C. HOWARD, Judge and CYNTHIA L. MARTIN, Judge.

CYNTHIA L. MARTIN, Judge.

National Union Fire Insurance Company ("National Union") appeals from a judg-

ment in a declaratory judgment action filed by Dodson International Parts, Inc. ("Dodson"), which found that an insurance policy issued by National Union to Dodson was ambiguous and thus provided coverage for a third party claim asserted against Dodson, and which found that National Union's denial of coverage was without just cause or excuse. We affirm.

### Factual and Procedural History

Dodson is in the aircraft salvage business. National Union issued a commercial general liability coverage aviation policy ("Policy") to Dodson[1] for the period August 28, 1997, to August 28, 1998. National Union used a standard commercial general liability ("CGL") form to issue the Policy. The Declarations Page indicates the only coverage purchased by Dodson was for Products/Completed Operations at an aggregate limit of $5,000,000.[2]

On April 10, 1998, Dodson was hired by Ameristar Jet Charter, Inc. ("Ameristar") to recover a Falcon 20 Jet ("Aircraft") that had made an emergency landing on a levee near Kansas City Downtown Airport. Dodson retrieved the Aircraft from the levee and transported it to the Executive Beechcraft hangar at the Airport.

On April 16, 1998, Dodson was advised that there was damage to the fuselage of the Aircraft unrelated to the Aircraft's emergency landing. The damage involved distortion of the fuselage. Ameristar and Sierra American Corporation ("Sierra")[3] claimed that the Aircraft had been totaled by virtue of the fuselage distortion, where the relatively minor damage caused by the emergency landing could otherwise have been easily repaired. Ameristar and Sier-

ra claimed Dodson caused the fuselage distortion while disassembling and transporting the Aircraft. Dodson claimed the fuselage distortion occurred after the Aircraft was delivered to the hangar.

On June 19, 1998, Dodson was sued in the Circuit Court of Jackson County, in *Ameristar Jet Charter, Inc. v. Dodson International Parts, Inc.*, Case No. 98 CV 14586 (the "Ameristar Lawsuit") for the damage to the Aircraft and for Ameristar's loss of use of the Aircraft.

In response to the Ameristar Lawsuit, Dodson submitted a claim to National Union. Robert McNabb ("McNabb"), a claims manager for National Union's agent, AIG Aviation ("AIG"), handled Dodson's claim. McNabb reviewed the petition filed in the Ameristar Lawsuit. McNabb then obtained a statement from Robert Dodson, Jr. ("Mr. Dodson"), the President of Dodson, on March 19, 1999. During the recorded statement, McNabb noted that the Policy provided "coverage for products and completed operations" up to $5,000,000. McNabb then said:

> I realize you don't have an attorney's view, but take my word for it this statement [referring to the petition filed in the Ameristar Lawsuit] alleged that the damage to the aircraft by Dodson was done while the aircraft was in Dodson's care, custody, and control. In other words, during the retrieval process. Either true or false—that is what the plaintiff alleged. Is that your understanding?

Mr. Dodson agreed that the plaintiffs in the Ameristar Lawsuit were "trying to claim" that the damage to the Aircraft occurred while it was in Dodson's care,

---

1. The Policy also included Dodson Aviation, Inc., Dodson Investment, Inc., and Kansas Air Investments. Inc. as named insureds.

2. See footnote 10, *infra*.

3. Ameristar leased the Aircraft from Sierra for its business of delivering parts to automobile manufacturers.

custody, and control. McNabb conducted no other investigation of Dodson's claim. McNabb recommended that the claim be denied.

On March 26, 1999, National Union sent Dodson a denial of coverage letter. National Union primarily relied on the care, custody, or control exclusion contained in the Policy, which excluded coverage for property damage to "personal property in the care, custody, or control of the Insured." National Union also refused to defend the Ameristar Lawsuit. Dodson requested that National Union reconsider its denial of coverage in June 1999. In July 1999, National Union reiterated its decision to deny coverage.

The Ameristar Lawsuit proceeded to trial. On May 31, 2002, the jury returned a verdict in favor of Ameristar on Ameristar's claim against Dodson for negligence in its handling of the Aircraft. The jury apportioned fault 70% to Dodson and 30% to Ameristar. The trial court entered judgment in favor of Ameristar and against Dodson in the amount of $1,435,000.

On appeal, the Supreme Court reversed and remanded the case for a new trial on the issue of damages. *Ameristar Jet Charter, Inc. v. Dodson Int'l Parts, Inc.*, 155 S.W.3d 50, 60 (Mo. banc 2005). Dodson and Ameristar reached a settlement agreement in the amount of $1,300,000 in approximately October 2008.

In July 2002, while the judgment in the Ameristar Lawsuit was on appeal, Dodson once again requested that National Union reconsider its denial of coverage. Dodson claimed that the damage to the Aircraft did not occur when the Aircraft was within Dodson's care, custody, or control, but instead occurred after the Aircraft had been delivered to the Executive Beechcraft hangar. Dodson contended in the Ameristar Lawsuit that the distortion of the fuselage occurred when straps securing the Aircraft to the transport vehicle were improvidently released after the Aircraft was delivered to the hangar. Dodson claimed that once the straps were released, the structural support for the fuselage was compromised.

In response to Dodson's renewed request for coverage, National Union sought a coverage opinion from Kansas attorney Scott Gunderson ("Gunderson"). In an opinion letter dated October 9, 2002, Gunderson concluded that he was comfortable with denial of the claim. Though Gunderson reminded that the burden is on the insurer to prove that an exclusionary cause applies, he counseled against National Union filing a declaratory judgment action to determine coverage. Gunderson explained that his "general rule-of thumb relative to declaratory judgment actions is, unless you are confident you will get summary judgment, don't file it." On January 6, 2003, Gunderson sent Dodson a letter on National Union's behalf which again denied coverage based on the care, custody, or control exclusion.

On April 1, 2004, Dodson filed a declaratory judgment action against National Union[4] seeking a determination that the Policy provided coverage for the Ameristar Lawsuit and seeking attorney's fees for National Union's denial of coverage without just cause or excuse pursuant to Kan. Stat. Ann. Section 40–256 (2000).[5] On June 30, 2006, National Union filed a motion for summary judgment alleging that Dodson's lawsuit was barred by the doc-

---

**4.** Dodson also asserted claims against other parties, but those claims were either resolved or otherwise disposed of by the time of trial.

**5.** The declaratory judgment action was filed before the Supreme Court's opinion in *Ameristar* and, thus, before Dodson and Ameristar reached their settlement.

trine of collateral estoppel because the jury's verdict in the Ameristar Lawsuit confirmed that the damage to the Aircraft occurred while the Aircraft was in Dodson's care, custody, or control. National Union further claimed that the uncontroverted evidence otherwise established that the damage to the Aircraft occurred while the Aircraft was in Dodson's care, custody, or control. On July 20, 2006, Dodson filed a motion for partial summary judgment claiming that the care, custody, or control provision in the Policy is ambiguous. Dodson also claimed that it should be awarded its attorney's fees in the declaratory judgment action because National Union's denial of coverage was without just cause or excuse under section 40–256.

On March 1, 2007, the Honorable John M. Torrence entered an order and judgment granting Dodson's motion for partial summary judgment in part and denying National Union's motion for summary judgment.[6] Judge Torrence held that the care, custody, or control exclusion in the Policy is ambiguous, requiring its construction in favor of Dodson. Judge Torrence held that "in construing the insurance contract most favorably to the insured, the Court determines that the provision does not exclude coverage for the damage sustained by the aircraft." Judge Torrence denied Dodson's request for attorney's fees under section 40–256.

Dodson's lawsuit proceeded to a bench trial before the Honorable Peggy Stevens McGraw on September 9, 2009. On October 28, 2009, Judge McGraw entered a judgment. On November 20, 2009, Judge McGraw entered an amended judgment after a hearing to take evidence on Dodson's attorney's fees awardable under sec-

tion 40–256. On December 9, 2009, Judge McGraw entered a second amended judgment in favor of Dodson ("Judgment").

The Judgment acknowledged Judge Torrence's order finding the care, custody, or control exclusion to be ambiguous. The trial court concluded, therefore, that the care, custody, or control provision "does not exclude coverage for the damage sustained by the aircraft during Plaintiff's salvage operation." The trial court further concluded that National Union denied coverage without just cause or excuse under section 40–256. In this context, the trial court found that "the care, custody, or control exclusion in the Policy cannot be applied unless the damage to the aircraft actually occurred while the aircraft was in Dodson's care, custody, or control." The trial court found that "the evidence presented in the underlying action strongly supported that the damage to the aircraft did not occur until after the plane had been delivered to Executive Beechcraft." The trial court thus concluded that "any claim for damage to the aircraft that arose while at Executive Beechcraft, after Dodson relinquished possession of the aircraft, would not be subject to the care, custody, or control exclusion."

The Judgment awarded Dodson damages in the amount of $2,528,679.92, plus post-judgment interest. The damage award included the $1,300,000 settlement of the Ameristar Lawsuit, Dodson's defense costs incurred in the Ameristar Lawsuit in the amount of $475,607.28, interest on those costs at 4% equaling $138,072.64 through the date of Judgment, and $615,000 in attorney's fees awarded under section 40–256.

---

**6.** Judge Torrence's order and judgment was entered before Dodson and Ameristar reached

their settlement.

National Union appeals.[7] It contends the trial court erred in concluding that the care, custody, or control exclusion is ambiguous and that the exclusion applies to deny coverage under the uncontroverted facts of this case. It contends that the trial court erred in refusing to treat Dodson as collaterally estopped to deny that the care, custody, or control exclusion applies given the outcome in the Ameristar Lawsuit. It contends that the trial court erred in concluding that National Union denied coverage without just cause or excuse pursuant to section 40–256.

### Choice of Law/Standard of Review

Missouri has adopted sections 188 and 193 of the RESTATEMENT (SECOND) OF CONFLICT OF LAWS (1971) for choice of law issues in disputes involving insurance contracts. *Viacom, Inc. v. Transit Cas. Co.*, 138 S.W.3d 723, 724–25 (Mo. banc 2004); *Egnatic v. Nguyen*, 113 S.W.3d 659, 665 (Mo.App. W.D.2003). Section 188 provides that the law of the state with the most significant relationship to the transaction and parties governs. RESTATEMENT (SECOND) OF CONFLICT OF LAWS section 188(1). Section 193 of the RESTATEMENT (SECOND) OF CONFLICT OF LAWS provides that the "validity of . . . [the] insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy."

Dodson is a Kansas corporation with its principal place of business in Rantoul, Kansas. National Union is registered to do business in Kansas. The Policy was negotiated and issued to Dodson in Kansas. The parties agree that Kansas law applies to the resolution of the issues on appeal. We see no reason to conclude otherwise, as this agreement is consistent with the applicable law. Though Kansas law applies to this case, both parties agree that Missouri and Kansas apply equivalent rules to the construction of insurance policies in general and to the construction of exclusionary clauses in particular.

"The interpretation of an insurance policy, and the determination whether coverage and exclusion provisions are ambiguous, are questions of law that this Court reviews *de novo*." *Burns v. Smith*, 303 S.W.3d 505, 509 (Mo. banc 2010). "[T]he burden of proof is on the insurer and if reasonably possible [an exclusionary] clause will be construed so as to afford coverage." *Am. Family Mut. Ins. Co. v. Brown*, 657 S.W.2d 273, 275 (Mo. App. W.D.1983) (citing *Giokaris v. Kincaid*, 331 S.W.2d 633, 641 (Mo.1960)). The burden of proof is also upon the insurer to establish that a policy exclusion applies to the circumstances of the particular case. *Marquis v. State Farm Fire & Cas. Co.*, 265 Kan. 317, 961 P.2d 1213, 1220 (1998) (citing *Upland Mut. Ins., Inc. v. Noel*, 214 Kan. 145, 519 P.2d 737, 741 (1974)).

A trial court's determination of whether an insurer has denied coverage without just cause or excuse pursuant to section 40–256 is reviewed for an abuse of discretion. *Conner v. Occidental Fire & Cas. Co. of N.C.*, 281 Kan. 875, 135 P.3d 1230, 1240 (2006); *Tradesmen Int'l, Inc. v. Wal–Mart Real Estate Bus. Trust*, 35 Kan. App.2d 146, 129 P.3d 102, 114 (2006). "The burden is on the party alleging the abuse." *Johnson v. Westhoff Sand Co.*, 281 Kan. 930, 135 P.3d 1127, 1135 (2006).

### Analysis

### Point I

In its first point, National Union contends the trial court erred in conclud-

---

**7.** Dodson filed a cross-appeal, WD71941, which was thereafter voluntarily dismissed.

ing that the care, custody, or control exclusion in the Policy is ambiguous and that the exclusion applies to deny coverage under the uncontroverted facts of this case. This point relied on raises two subjects: does the care, custody, or control exclusion apply to the facts in this case, and if so, is the exclusion ambiguous? As noted above, National Union had the burden of proof as to both subjects. Because the trial court disposed of the issue of coverage by concluding that the exclusion relied upon by National Union is ambiguous, we will first address whether the exclusion is ambiguous. If we conclude that it is, then the exclusion cannot operate to deny coverage, rendering immaterial any discussion of whether the exclusion applies to the particular circumstances of this case.

 "[T]he construction and effect of a written contract of insurance is a matter of law to be determined by the court." *Goforth v. Franklin Life Ins. Co.*, 202 Kan. 413, 449 P.2d 477, 481 (1969).

> When an insurance contract is not ambiguous, the court may not make another contract for the parties. Its function is to enforce the contract as made. To be ambiguous the contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language.

*Clark v. Prudential Ins. Co. of Am.*, 204 Kan. 487, 464 P.2d 253, 256 (1970) (citations omitted). If "the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning," then the contract is ambiguous. *Id.* If the contract is ambiguous, the construction most favorable to the insured prevails. *Am. Media, Inc. v. Home Indem. Co.*, 232 Kan. 737, 658 P.2d 1015, 1019 (1983). "This is so because the insurer, as the one who prepared the con-

tract, must suffer the consequences of failing to make the terms clear." *City of Salina, Kan. v. Md. Cas. Co.*, 856 F.Supp. 1467, 1475–76 (D.Kan.1994).

 These principles are acutely applicable where an insurer seeks to deny coverage based upon the application of an exclusionary provision. An insurer has the duty to define limitations to coverage in clear and explicit terms. *Marshall v. Kan. Med. Mut. Ins. Co.*, 276 Kan. 97, 73 P.3d 120, 130 (2003). "As a general rule, exceptions, limitations, and exclusions to insurance policies are narrowly construed." *City of Shawnee, Kan. v. Argonaut Ins. Co.*, 546 F.Supp.2d 1163, 1174 (D.Kan.2008) (citing *Marshall*, 73 P.3d at 130); *see also Allison v. Nat'l Ins. Underwriters*, 487 S.W.2d 257, 262 (Mo.App. 1972) ("Restrictive or exclusionary clauses in an insurance contract are to be strictly construed...."). "[I]f [an exclusionary provision is] ambiguous, a favorable construction for [the] insured must be adopted." *Allison*, 487 S.W.2d at 262. "The language of an exclusion ... must ... be afforded its plain, ordinary, meaning." *Argonaut Ins. Co.*, 546 F.Supp.2d at 1174 (citing *First Fin. Ins. Co. v. Bugg*, 265 Kan. 690, 962 P.2d 515, 521 (1998)). However, "[t]he court must consider the terms of an insurance policy as a whole, without fragmenting the various provisions and endorsements." *Id.* (citing *Marshall*, 73 P.3d at 130); *see Allison*, 487 S.W.2d at 262.

Here, National Union relies exclusively on the application of the care, custody, or control exclusion in the Policy to deny coverage. That exclusion excepts from coverage "personal property in the care, custody, or control of the Insured." Dodson contends the exclusion is ambiguous. Specifically, Dodson contends the care, custody, or control exclusion does not apply to Products/Completed Operations cov-

erage because the exclusion appears in a portion of the Policy that applies only to general liability coverage *other than* Products/Completed Operations—coverage which Dodson did not purchase.[8] In support of this argument, Dodson contends the Products/Completed Operations coverage is defined in terms of Dodson's **"work,"** where the insuring agreement for general liability coverage other than Products/Completed Operations is defined in terms of Dodson's **"aviation operations,"** terms afforded separate and distinguishable definitions under the Policy. Though Dodson raises other bases for its claim of ambiguity,[9] we need only address this basis, as it is dispositive.

### The Policy Terms

Material to this case, the Policy is comprised of a Declarations Page and a basic CGL Form titled "Commercial General Liability Coverage Aviation Policy." The CGL Form is divided into six sections: Section I—Coverages; Section II—Who is an Insured; Section III—Limits of Insurance; Section IV—Policy Conditions; Section V—Definitions; and Section VI—Common Policy Exclusions.

On the Declarations Page, Item 3 provides that "[i]n return for the payment of premium, and subject to all the terms of this Policy, we agree to provide insurance as stated in this Policy." The "Coverage" categories are then listed as follows:

| *Coverage* | *Limits of Insurance* |
|---|---|
| Commercial General Liability Coverage | |
| General Aggregate Limit (other than Products/Completed Operations) | $ Not applicable |
| Products/Completed Operations Aggregate Limit | $ 5,000,000. |
| Personal and Advertising Injury Aggregate Limit | $ Not Covered |
| Each Occurrence Limit | $ 5,000,000. |
| Fire Damage Limit (any one fire) | $ Not Covered |
| Medical Expense Limit (any one person) | $ Not Covered |
| Hangarkeeper's Liability Coverage | |
| Each Aircraft Limit | $ Not Covered |
| Each Loss Limit | $ Not Covered |
| Deductible (each aircraft) $ N/A | TOTAL ADVANCE PREMIUM $ 24,924 |

Thus, the only coverage purchased by Dodson, according to the parties, was Products/Completed Operations Coverage.[10]

8. See footnote 10, *infra*.

9. Dodson also claims the care, custody, or control exclusion is inconsistent with an exclusion for property damage arising out of transportation of property unless the damage arises out of loading or unloading the property, and with an exclusion for property damage arising out of the use of property where use is defined to include loading and unloading. Finally, Dodson argues the care, custody, or control exclusion is ambiguous because its use of the phrase "personal property" is open to several constructions.

10. We so hold, principally, because that is the supposition of the parties as confirmed at oral argument. We observe, however, that National Union's use of "Not applicable" to address the general aggregate limit for "other than Products/Completed Operations," instead of "Not Covered" as used to identify coverage categories expressly excluded from the Policy, could permit Dodson to argue that it had, in fact, purchased general liability coverage for other than Product/Completed Operations subject to no aggregate limit, though subject to an each occurrence limit of $5,000,000.

Some of the coverage categories identified on the Declarations Page are separately addressed in Section I—Coverages. Section I, Coverage A addresses "Bodily Injury and Property Damage Liability," although that is not a coverage category listed on the Declarations Page. Section I, Coverage B addresses "Personal and Advertising Injury Liability," which is a coverage category listed on the Declarations Page. Section I, Coverage C addresses "Medical Payments," which is a coverage category listed on the Declarations Page. Section I, Coverage D addresses "Hangarkeepers' Liability," which is a coverage category listed on the Declarations Page. Coverages A, B, C, and D each include their own "insuring agreement" and identified "exclusions" applicable to the coverage therein described.

The Policy does not explain why "Commercial General Liability Coverage (other than Products/Completed Operations)," "Products/Completed Operations," and "Fire Damage" do not have their own "Coverage" sections. Nor does the Policy clearly state that Section I, Coverage A, addressing "Bodily Injury and Property Damage Liability," is intended to include the coverage categories of "Commercial General Liability Coverage (other than Products/Completed Operations)," "Products/Completed Operations," and "Fire Damage."

We know, however, that National Union necessarily contends that Section I, Coverage A applies, at a minimum, to both "Commercial General Liability Coverage (other than Products/Completed Operations)" and to "Products/Completed Operations," as the care, custody, or control exclusion on which National Union relies to deny Dodson's claim appears in Section I, Coverage A, though the "definition" of Products/Completed Operations appears in

Section V—Definitions. In response, Dodson argues that the applicability of Section I, Coverage A, (and thus the care, custody, or control exception), to Products/Completed Operations is ambiguous. We must determine, therefore, whether the Policy unambiguously incorporates Products/Completed Operations coverage within the purview of Section I, Coverage A.

### The Scope of Section I, Coverage A

Section I, Coverage A, paragraph 1 of the Policy describes the Coverage A "Insuring Agreement." The Insuring Agreement provides, in pertinent part, and with emphasis added, as follows:

1. Insuring Agreement.

(a) We will pay those sums that the insured becomes legally obligated to pay as damages because of ... *property damage to which this insurance applies* resulting *from your Aviation operations* ....

(1) The *amount we will pay for damages is limited as described in Section III—LIMITS OF INSURANCE* ....

(b) This insurance applies to ... *property damage* only if:

(1) The ... property damage is *caused by an occurrence* that takes place in the coverage territory....

The reference in paragraph 1(a) to "property damage to which *this insurance* applies" is partially explained by paragraph 1(b)(1), which says that *"this insurance* applies" to property damage caused by an "occurrence."[11] However, it is not clear whether *"this insurance"* is meant to refer only to the insurance described in Section I, Coverage A, and if so, what *"insurance"* is described in Section I, Coverage A given the coverage categories described

---

**11.** We discuss the definition of "occurrence," *infra.*

on the Declarations Page. We look elsewhere, therefore, for guidance.

Paragraph 1(a)(1) states that the amount that will be paid for damages will be limited as described in Section III—Limits of Insurance. This exact reference also appears in the insuring agreement for Section I, Coverage B (Personal and Advertising Injury Liability), and in the insuring agreement for Section I, Coverage D (Hangarkeepers' Liability). Section III—Limits of Insurance provides in pertinent part, in discussing Coverage A, as follows:

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay....

2. The General Aggregate Limit is the most we will pay for the sum of:

(a) Damages under Coverage A, except damages because of bodily injury or property damage included in the products-completed operations hazard;....

3. The Products–Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of bodily injury and property damage included in the products-completed operations hazard....

6. Subject to 5. above, the Fire Damage Limit is the most we will pay under Coverage A for damages because of property damage to premises rented or leased to you arising out of any one fire.

These provisions of Section III—Limits of Insurance thus describe the limits of what will be paid *under Coverage A* for bodily injury and property damage included in the "products-completed operations hazard," in the "general liability other than products-completed operations hazard," and for "fire damage." This suggests an intent to include "Commercial General Liability Coverage (other than Products/Completed Operations)," "Products/Completed Operations," and "Fire Damage," (coverage categories identified on the Declarations Page, but lacking separate Coverage sections in the Policy) within Section I, Coverage A. This further suggests that the phrase *"property damage to which this insurance applies "* in Section I, Coverage A, paragraph 1(a) is intended to mean property damage for which Section III—Limits of Insurance permits payments under Coverage A. *See Hawkeye–Sec. Ins. Co. v. Davis,* 6 S.W.3d 419, 424–25 (Mo. App. S.D.1999) (holding that CGL Form which obligates insurer to "pay those sums that the insured becomes legally obligated to pay as damages because of ... 'property damage' to which this insurance applies," does not, standing alone, explain the scope of the CGL Form, but when coupled with discussion in Section III—Limits of Insurance of Products/Completed Operations payments under Coverage A, permits conclusion that policy's definition of "products-completed operations hazard" describes a coverage within the CGL Form).

Assuming this to be true, we look to other provisions in Section I, Coverage A to determine whether they can be similarly read to require the conclusion that Section I, Coverage A incorporates Products/Completed Operations within its scope. *Argonaut Ins. Co.,* 546 F.Supp.2d at 1174 ("[C]ourt must consider the terms of an insurance policy as a whole...."). Recall that Section I, Coverage A, paragraphs 1(a) and (b) define the scope of the Insuring Agreement as limited to "property damage ... resulting from your Aviation operations ... caused by an occurrence."

"Aviation operations" is defined in Section V–Definitions, paragraph 5 as "all operations arising from the ownership, maintenance or use of locations for aviation activities including that portion of roads or other accesses that adjoin these locations. Aviation operations include all operations necessary or incidental to aviation activities." "Aviation activities" is not defined.

We are obliged, therefore, to afford these terms their common and ordinary meaning. *Brumley v. Lee,* 265 Kan. 810, 963 P.2d 1224, 1232 (1998). "Aviation" is defined by THE AMERICAN HERITAGE COLLEGE DICTIONARY, 95 (3rd ed.1993) as "1. The operation of aircraft. 2. The design, development, and production of aircraft." "Activity" is defined by THE AMERICAN HERITAGE COLLEGE DICTIONARY 14 (3rd ed.1993) as "3a. A specified pursuit or action."

"Occurrence" is defined in Section V—Definitions, paragraph 14 as "an *accident,* including continuous or repeated exposure to substantially the same general harmful conditions." (Emphasis added.)

Employing these collective definitions, the Insuring Agreement in Section I, Coverage A provides coverage for property damage caused by an accident resulting from Dodson's operations on locations owned, maintained, or used by Dodson to operate aircraft or to design, develop, or produce aircraft. If the Section I, Coverage A Insuring Agreement is intended to unambiguously include Products/Completed Operations coverage within its scope, then the definition of Products/Completed Operations should be interchangeable with the scope of the Coverage A Insuring Agreement. We determine that it is not.

The "products-completed operations hazard" is defined in Section V—Definitions, paragraph 16, with emphasis added, as:

(a) Products-completed operations hazard includes all bodily injury and property damage occurring ***away from premises you own, lease, or rent and arising out of your product or work*** except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned.

(b) Your work will be deemed completed at the earliest of the following times:

(1) When all of the work called for in your contract has been completed.

(2) When all of the work to be done at the site has been completed if your contract calls for work at more than one site.

(3) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed. . . .

Section V—Definitions, paragraph 21 defines "work" [12] as:

Your work

(a) means:

(1) Work or operations performed by you or on your behalf; and

(2) Materials, parts or equipment furnished in connection with such work or operation.

Your work

(b) includes:

(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of your work; and

---

**12.** We have not discussed "products," which are also included within the definition of Products/Completed Operations, because we believe the nature of Dodson's "work" for Ameristar clearly involved services and not goods manufactured, sold, handled, distributed, or disposed of by Dodson, the definition of "products" in Section V–Definitions, paragraph 20 of the Policy.

(2) The providing of or failure to provide warnings or instructions.

Summarized, the "scope" of Products/Completed Operations coverage includes property damage occurring away from premises Dodson owns, leases, or rents, and arising out of work or operations performed by Dodson, including warranties and representation with respect to those operations, but only if the property damage occurs after Dodson's work has been completed or abandoned.

The scope of Products/Completed Operations coverage is not interchangeable with the scope of the Insuring Agreement set forth in Section I, Coverage A in three material respects. First, the definition of "work" is necessarily broader then the definition of "Aviation operations." Second, the definition of "work" is tied to locations not included within the definition of "Aviation operations." Third, the definition of "work" is broader then the definition of "occurrence."

First, the definition of "work" is in no way tied to, or cross referenced to, "Aviation operations." "Work" has its own definition and refers broadly to *any* "work or operations" performed by or for Dodson. "Aviation operations" are limited by definition to aviation activities. It is self-evident that "work" is broader than "Aviation operations." In fact, it is arguable that the "work" of Dodson, which the parties do not contest is exclusively aircraft salvage operations, would not fit within the definition of "Aviation operations," as salvaging an aircraft that has been wrecked, and delivering it to a third party for disposition, does not appear to involve operating, designing, developing, or producing an aircraft at a location Dodson used for aviation activities. More to the point, because "work" and "Aviation operations" are not synonymous, they are not interchangeable in the Cover-

age A Insuring Agreement, revealing an inherent ambiguity.

Second, where Section I, Coverage A is limited to liabilities associated with *operations arising from Dodson's ownership, maintenance, or use of locations* for aviation activities, Products/Completed Operations is limited to bodily injury and property damage *occurring away from premises Dodson owns, leases, or rents.* These defined locations for covered activities are inconsistent, at least in part, and are not interchangeable, revealing yet another inherent ambiguity.

Third, where Section I, Coverage A is limited to "occurrences," defined as "accidents," Products/Completed Operations makes no reference to its scope being limited to "occurrences" or "accidents." There is precedent in Kansas that a policy which defines "occurrence" in terms of an "accident," without defining accident, is ambiguous. *Brumley,* 963 P.2d at 1232. In *Fidelity & Deposit Co. of Maryland v. Hartford Casualty Insurance Co.,* 189 F.Supp.2d 1212, 1216–19 (D.Kan.2002), the court agreed, and found that property damage to an insured's work as a result of negligent workmanship would be covered, either because "accident" should be defined to apply to negligent conduct (including negligent construction) that results in unintended damage, or because the term "accident," is ambiguous requiring its construction in the insured's favor. Missouri courts have concluded that where a liability policy restricts coverage to an "occurrence" defined as an "accident," the term encompasses a negligence claim. *See Great Am. Ins. Co. v. Pearl Paint Co.,* 703 S.W.2d 601, 602 (Mo.App. E.D.1986). Even if we accept that the undefined term "accident" includes negligence claims, this definition of accident would not include property damage caused by a breach of warranties and representations. A breach

of a warranty or representation is not an "accident." *Hawkeye–Sec.*, 6 S.W.3d at 426 (citing *Am. States Ins. Co. v. Mathis*, 974 S.W.2d 647, 650 (Mo.App. E.D.1998) ("[B]reach of a defined contractual duty cannot fall within the term 'accident.' ")). The definition of "work" includes "warranties and representations at any time with respect to the fitness, quality, durability, performance or use of your work." The definition of "work" is, therefore, broader than the definition of "occurrence." As a result, "work" and "occurrence" are not interchangeable, revealing yet another ambiguity.

We conclude, therefore, that the application of Section I, Coverage A to Products/Completed Operations is subject to two interpretations. By reference to Section III—Limits of Insurance, one can argue that Section I, Coverage A covers both Products/Completed Operations and Commercial General Liability other than Products/Completed Operations. However, the scope of the Insuring Agreement set forth in Section I, Coverage A is inconsistent in several material respects with the scope of Products/Completed Operations coverage. It is, therefore, genuinely uncertain which interpretation is the proper one. As a result, the Policy is ambiguous with respect to the application of Section I, Coverage A to Products/Completed Operations coverage. *Clark*, 464 P.2d at 256. We must, therefore, construe the Policy in Dodson's favor. *Allison*, 487 S.W.2d at 262. Because the care, custody, or control exclusion on which National Union relies to deny coverage appears in Section I, Coverage A, we conclude that the exclusion does not apply to Products/Completed Operations coverage.

Our conclusion is reinforced by an examination of some of the exclusions set forth in Section I, Coverage A. Section I, Coverage A, paragraph 2 is titled "Exclusions."

Of pertinence to this case are the following exclusions:

2. Exclusions.

This insurance does not apply to: . . .

(j) Property damage to: . . .

(1) Property you own, lease, rent, or occupy;

. . . .

(4) Personal property in the care, custody or control of the insured;

(5) That particular part of real property on which you or any contractor or subcontractor working directly or indirectly on your behalf are performing operations, if the property damage arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because your work was incorrectly performed on it. . . .

Paragraph (6) of this exclusion (j) does not apply to property damage in the products-completed operations hazard.

(*l*) Property damage to your work arising out of it or any part of it and included in the products-completed operations hazard.

Paragraph (j)(1) involves damage to property that Dodson owns, leases, rents, or occupies. Products/Completed Operations coverage is limited to property damage from Dodson's work occurring *away* from premises Dodson owns, leases, or rents. The purpose served by this exclusion is arguably already accomplished based on the defined scope of Products/Completed Operations coverage. Paragraph (j)(5) addresses damage to real property by operations that are being performed, and *thus operations that are not complete*, a work status already excluded from Products/Completed Operations coverage. This exclusion is, therefore, superfluous to

framing the scope of Products/Completed Operations coverage.

National Union argues that paragraph (j)(4), the care, custody, or control exclusion, is applicable to Products/Completed Operations because its operation yields the same result as the exclusion for "uncompleted work" from Products/Completed Operations coverage. National Union argues that work that is not complete is work that remains in Dodson's care, custody, or control. According to National Union, the care, custody, or control exclusion, and the exclusion for uncompleted work, are simply repetitive. This argument actually undercuts National Union's claim that Products/Completed Operations is included within Section I, Coverage A. If the care, custody, or control exclusion is repetitive of the exclusion for uncompleted work, then, as with exclusions, (j)(1) and (j)(5), the care, custody, or control exclusion is superfluous to defining the parameters of Products/Completed Operations coverage. "Policies of liability insurance contain exclusions which bar coverage for liability which otherwise would fall within the coverage of the contract." 30 David D. Noce, MISSOURI PRACTICE SERIES: INSURANCE LAW AND PRACTICE section 7:23 (2nd ed.2009). Superfluous exclusions which "except" coverage that never existed serve no purpose, suggesting that the exclusions do not apply to Products/Complete Operations coverage. In any case, National Union's supposition that all "work" is either "completed," or within an insured's "care, custody, or control" is erroneous. See, e.g., *Kirchner v. Hartford Accident & Indem. Co.*, 440 S.W.2d 751 757–58 (Mo.App.1969) (holding that steel contractor whose contract work was not complete was not in "control" of building when erected steel collapsed while contractor was not on site, such that care, custody, or control exclusion did not apply to defeat coverage).

National Union also argues that paragraph (j)(6)'s specific reference to the fact that the exclusion does not apply to property damage included in the "products-completed operations hazard" demonstrates that all Coverage A exclusions apply to Products/Completed Operations *unless* the Policy expressly indicates to the contrary. We disagree. We need look no further than to the exclusion described in Section 1, Coverage A, paragraph 2, paragraph (*l*), which provides that Coverage A does not apply to "property damage to your work arising out of it or any part of it *and included in products-completed operations hazard.*" (Emphasis added.) This exclusion suggests that property damage to work that is covered by Products/Completed Operations *is not* included within Coverage A, strongly suggesting that Products/Completed Operations coverage is not incorporated within the scope of Coverage A. In this same vein, the exclusion at paragraph (j)(6) so heavily relied on by National Union is of nearly identical import to the exclusion at paragraph (*l*). The exclusion at paragraph (j)(6) simply states that property requiring restoration, repair, or replacement because Dodson's work was incorrectly performed is *excluded* from Coverage A if that damage is included in the "products-completed operations hazard." As with paragraph (*l*), paragraph (j)(6) reinforces that Section I, Coverage A does not incorporate Products/Completed Operations coverage within its scope.

In light of the foregoing, the application of Section I, Coverage A to Products/Completed Operations coverage is ambiguous. As a result, the application of the care, custody, or control exclusion described in Section I, Coverage A to Products/Completed Operations coverage is ambiguous. We are required to construe the Policy, and in particular, the application of the

care, custody, or control exclusion, in Dodson's favor. *Fid. & Deposit Co. of Md.*, 189 F.Supp.2d at 1224 ("When an insurer intends to restrict coverage, 'it must use clear and unambiguous language in doing so, otherwise the insurance policy will be construed in favor of the insured.'") (quoting *Marquis v. State Farm Fire & Cas. Co.*, 265 Kan. 317, 961 P.2d 1213, 1220 (1998)). We therefore conclude that the care, custody, or control exclusion cannot be applied to defeat coverage for Dodson's claim arising out of the Ameristar Lawsuit. *Allison*, 487 S.W.2d at 262 ("Ambiguous provisions in an insurance policy cannot avail as a policy defense.")

By so concluding, we do not leave Products/Completed Operations coverage dangling in the wind without clear scope or application. Whether intended or not, the definition of Products/Completed Operations is, in effect, a self contained insuring agreement with its own delineated exclusions. The test is not what an insurer subjectively intended a policy to mean, but rather what a reasonable person in the insured's position would have understood the policy to mean. *Md. Cas. Co.*, 856 F.Supp. at 1476. We conclude that a reasonable person reading the Policy would not comprehend that National Union "intended" Products/Completed Operations coverage to be encompassed within Section I, Coverage A. The definition of "products-completed operations hazard" describes coverage for bodily injury and property damage, both of which are defined terms under Section V—Definitions at paragraphs (6) and (17), respectively. The definition of "products-completed operations hazard" limits coverage for bodily injury and property damage to that arising out of Dodson's "products" or "work," both of which are defined terms under Section V—Definitions at paragraphs (20) and (21) respectively. The definition of "products-completed operations hazard" *excludes*

from coverage bodily injury or property damage from "work" unless it occurs away from premises Dodson owns, leases, or rents. The definition of "products-completed operations hazard" *excludes* from coverage bodily injury or property damage arising out of "work" that has not yet been completed or abandoned. From the perspective of an insured, there is no need to look beyond the definition of "products-completed operations hazard" (and to the defined terms therein employed) to understand the parameters of Products/Completed Operations coverage afforded by the Policy. Ambiguity is determined from the perspective of a layman. *Logan v. Victory Life Ins. Co.*, 175 Kan. 88, 259 P.2d 165, 171 (1953). National Union's attempt to complicate the scope of Products/Completed Operations coverage by requiring its incorporation into Section I, Coverage A creates unnecessary uncertainty, confusion and ambiguity.

We are aware that in *Hawkeye–Security* our Southern District concluded that the insuring agreement in the CGL policy in that case included Products/Completed Operations coverage within its scope. 6 S.W.3d at 424–25. For the reasons summarized, below, *Hawkeye–Security*, does not control the disposition of this case.

Although the cited portions of the policy in *Hawkeye–Security* appear, based on our reading, to be virtually identical to the Policy in this case, there is a critical distinction. In *Hawkeye–Security*, the court set out the Coverage A insuring agreement as "[w]e will pay those sums that the insured becomes legally obligated to pay as damages because of ... 'property damage' *to which this insurance applies* ...." *Id.* at 423 n. 1 (emphasis added). Notably absent was the modifying language, if any, which followed the phrase *"to which this insurance applies."* In contrast, the modifying language *"result-*

*ing from your Aviation operations* " follows the phrase *"to which this insurance applies"* in the Policy. *Hawkeye–Security*, therefore, never addressed the presence of a conflict between the modifier following the phrase "to which this insurance applies" in Coverage A and the definition of "work" incorporated into the definition of "products-completed operations hazard." Notably, *Hawkeye–Security* read the products-completed operations hazard "as describing a coverage within the CGL Form for the same type of injuries or damages covered by the rest of the CGL policy, but for a different period of time or location." *Id.* at 425. In our case, however, a locational limitation is contained in the Coverage A Insuring Agreement itself, through the use of the phrase "resulting from your Aviation operations," a locational limitation which is inconsistent with the definition of "products-completed operations hazard." That critical difference, alone, distinguishes *Hawkeye–Security* from this case.

Further, after observing that the Coverage A insuring agreement was limited to property damage resulting from an *"occurrence,"* defined as an *"accident,"* the court in *Hawkeye–Security* concluded that the subject claim, which involved the insured's breach of express warranties and representations, *was not covered* by the policy, because a breach of warranties and representations is not an "accident." *Id.* at 425–26. The court set out that policy's definition of "products-completed operations hazard." *Id.* at 422–23. The court did not, however, set out the definition of "work," though it acknowledged that the policy's definition of "work" included warranties and representations. *Id.* at 423. Notwithstanding, and for reasons that are not readily apparent, the court ignored the inconsistency between affording coverage for damage caused by an insured's breach of warranties and representation via the

definition of "products-completed operations hazard," while taking that coverage away via the definition of "occurrence" in Coverage A. In contrast, we cannot ignore that "work" is defined in Section V—Definitions, paragraph 21 to include warranties and representations, creating a violent and irreconcilable conflict between the "property damage" covered under Section I, Coverage A, and the "property damage" a reasonable insured could expect would be covered by Products/Completed Operations coverage. We conclude that *Hawkeye–Security* is thus distinguishable, at a minimum, if not of suspect result, as it failed to address this evident inconsistency which, in our view, compels the conclusion that inclusion of Products/Completed Operations within Section I, Coverage A of the Policy creates an intolerable ambiguity.

It is also significant that this case directly involves the applicability of the exclusions in Coverage A to Products/Completed Operations coverage. In *Hawkeye–Security*, by contrast, the court did not consider the applicability of the exclusions in the CGL coverage to the products-completed operations hazard, having determined the insuring agreement itself defeated coverage. Moreover, the court's discussion of the exclusions was solely in the context of addressing their application to the insured's alternative argument that coverage would be available under the "other than products/completed operations" part of the policy. *Id.* at 426. Ironically, the court said "[t]hese provisions [exclusions] defeat any coverage that would arguably be available under the 'other than products/completed operations' part of the policy," *id.*, suggesting the court believed the exclusions applied only to coverage other than Products/Completed Operations coverage. In this respect, *Hawkeye–Security* lends support to our

conclusion that applicability of the Coverage A exclusions to Products/Completed Operations coverage is, at best, ambiguous.

Because we have concluded that the Policy is ambiguous and that coverage of Dodson's claim was thus not appropriately denied, we need not address whether the care, custody, or control exclusion would have applied to the particular circumstances of Dodson's claim.

Point one is denied.

### Point II

In its second point on appeal, National Union contends that the trial court erred in denying National Union's motion for summary judgment and in granting Dodson's motion for partial summary judgment because *Dodson was collaterally estopped to deny that the Aircraft was in its care, custody, or control when it was damaged* given the jury verdict in the Ameristar Lawsuit, which verdict was upheld on appeal.

Without addressing the propriety of appealing from a denial of a motion for summary judgment,[13] we observe that this point is mooted by our determination that the care, custody, or control provision is ambiguous and cannot be applied to defeat coverage. Even if the Policy was not ambiguous, however, National Union's collateral estoppel claim would be unavailing.

The application of the care, custody, or control exclusion turns on *when* the property damage to the Aircraft occurred. "It is well settled that the time of the occurrence of an accident within the meaning of an indemnity policy is not the time the alleged wrongful act was committed, but it is the time when the complaining party was actually damaged." *Kirchner*, 440 S.W.2d at 756 (citing 57 A.L.R.2d 1389, Annotation: Liability Insurance–Time of Incident). The question of *when* the "property damage" to the Aircraft occurred was not decided by the jury in the Ameristar Lawsuit. The verdict director instructed:

> In your verdict, you must assess a percentage of fault to [Dodson], whether or not [Ameristar] was partly at fault, if you believe:
>
> First, Dodson
>
> (a) failed to follow the maintenance manual in the disassembly, loading and transportation of the aircraft, or
>
> (b) failed to comply with FAA rules or regulations in the disassembly, loading and transportation of the aircraft, or
>
> (c) caused the aircraft to be totaled by plaintiff's insurer by its handling of the aircraft, and
>
> Second, Dodson was thereby negligent, and
>
> Third, that as a direct result of such negligence plaintiff sustained damage.

The jury found that Dodson was negligent, though it apportioned fault 70% to Dodson and 30% to Ameristar.

The verdict director certainly foreclosed that Dodson's acts or omissions contributed to cause the damage to the Aircraft.

---

13. An order denying a motion for summary judgment is not a final, appealable judgment and is not reviewable on appeal. *Lopez v. Am. Family Mut. Ins. Co.*, 96 S.W.3d 891, 892 (Mo.App. W.D.2002). There is an exception where a denied motion for summary judgment is inextricably intertwined into a motion for summary judgment that has been granted. *Kaufman v. Bormaster*, 599 S.W.2d 35, 38 (Mo.App. E.D.1980). For the reasons herein described, we need not determine whether National Union's motion for summary judgment and Dodson's motion for partial summary judgment were sufficiently intertwined as to permit National Union to appeal from denial of summary judgment on its affirmative defense of collateral estoppel.

However, the verdict director did not require the jury to determine, one way or the other, *when* the damage to the Aircraft occurred. National Union does not contest that Dodson contended in the Ameristar Lawsuit that the damage to the Aircraft occurred *after* the Aircraft was delivered to the hangar. The jury's verdict assessing 70% fault to Dodson and 30% fault to the Owner could be viewed as consistent with Dodson's argument. Though the damage to the Aircraft was, based on the verdict director, facilitated by the means in which Dodson disassembled, loaded, and transported the Aircraft, determining *why* the damage happened is not the same as determining *when* the damage happened. *Kirchner*, 440 S.W.2d at 755–58. The jury's verdict did not preclude the issue of *when* the damage to the Aircraft occurred.

National Union also offers the appellate opinions issued in the Ameristar Lawsuit as additional "uncontroverted evidence" that the issue of *when* the damage occurred to the Aircraft has been determined. National Union observes that the court of appeals rejected Dodson's claim that the judgment in favor of Ameristar was not supported by substantial evidence, noting that an expert witness had identified "as specific causes of the deflection Dodson's failure to install a junction plate properly and its use of wooden blocks to support the airplane." *Ameristar Jet Charter, Inc. v. Dodson Int'l Parts, Inc.*, Nos. WD61655, WD61800, WD62141, 2004 WL 76342, at *8 (Mo.App. W.D. Jan.20, 2004).[14] This passage makes no reference, however, to *when* the deflection damage occurred and would not exclude the possibility that the referenced failures merely

contributed to permit the damage to occur *after* the Aircraft was delivered to the hangar as alleged by Dodson. National Union also claims that the Missouri Supreme Court's decision to affirm the trial court and to refuse to issue an extended opinion on the issue of whether substantial evidence supported the jury's finding that Dodson was negligent supports a finding of issue preclusion. *Ameristar*, 155 S.W.3d at 58. We have already concluded that the jury's verdict (and the resulting judgment) in the Ameristar Lawsuit did not determine the issue of *when* the damage to the Aircraft occurred. It follows that neither the opinion of the court of appeals nor of the Missouri Supreme Court can be viewed as having determined a factual issue not reached at trial.

 "Collateral estoppel can be applied only if a final judgment on the merits has been rendered involving the same issue sought to be precluded in the cause in question." *Orem v. Orem*, 149 S.W.3d 589, 592 (Mo.App. W.D.2004). Here, the final judgment in the Ameristar Lawsuit did not involve the same issue sought to be precluded in this case—that is to say, the Ameristar Lawsuit did not require disposition of whether the damage to the Aircraft occurred, exclusively or otherwise, *when* the Aircraft was in the Dodson's care, custody, or control, or, for that matter, before Dodson's work was completed or abandoned. Collateral estoppel would not have applied to this case to relieve National Union of the burden to independently prove that any exclusion on which it relied to deny coverage applied to the particular circumstances of the case. *Marquis*, 961 P.2d at 1220.

Point two is denied.

---

**14.** National Union's reliance on the court of appeals opinion ignores that upon transfer of the Ameristar Lawsuit to the Missouri Supreme Court, the court of appeals opinion

was deemed withdrawn. *See Collector of Revenue v. Parcels of Land*, 566 S.W.2d 475, 476 n. 1 (Mo. banc 1978).

### Point III

In point three, Dodson claims that the trial court erred in finding that National Union's denial of coverage under the Policy issued to Dodson was "without just cause or excuse" and in awarding Dodson attorney's fees pursuant to section 40–256. National Union claims that, at the time of the denial of coverage, a good faith legal controversy existed on the issue of coverage in that: (1) the petition in the Ameristar Lawsuit specifically alleged that Dodson negligently damaged the aircraft during Dodson's disassembly, loading, or transport of the aircraft; (2) the Policy contained the "care, custody or control" exclusion; and (3) National Union confirmed Dodson's activity in loading and transporting the aircraft during National Union's investigation before the denial of the claim.

Section 40–256 provides in pertinent part:

> That in all actions ... in which judgment is rendered against any insurance company ... if it appear from the evidence that such company ... *has refused without just cause or excuse to pay the full amount of such loss,* the court in rendering such judgment *shall* allow the plaintiff a reasonable sum as an attorney's fee for services in such action. . . .

"Whether an insurance company's refusal to pay is without just cause or excuse is determined on the facts and circumstances in each case." *Johnson,* 62 P.3d at 697. The issue is a question of fact to be decided by the trial court as the trier of the fact. *Miller v. Westport Ins. Corp.,* 288 Kan. 27, 200 P.3d 419, 424 (2009); *Conner,* 135 P.3d at 1240. In refusing to pay a claim, an insurance company has a duty to make a good faith investigation of the facts surrounding the claim. "If an insurance company's refusal is a frivolous and un-

founded denial of liability that is patently without any reasonable foundation, it is 'without just cause and excuse'" for purposes of section 40–256. *Md. Cas. Co.,* 856 F.Supp. at 1481. Only when there is a good faith legal controversy as to the insured's claim will the statutory award of attorney's fee be denied. *Id.*

National Union relied exclusively on the allegation in Ameristar's petition that Dodson negligently damaged the Aircraft while transporting the Aircraft to reach its initial decision to deny coverage. Though National Union interviewed Mr. Dodson before denying coverage, it sought no information from him about the means of disassembling, loading, or transporting the Aircraft, or any information from him about when or how the claimed damage to the Aircraft occurred from Dodson's perspective. National Union, through its agent McNabb, merely asked Mr. Dodson to confirm Ameristar's allegation. National Union's self serving reliance on Ameristar's allegation to deny coverage with no independent investigation into the factual basis for the allegation was inappropriate. *Id.* at 1480 (holding that when investigating obligation to defend claim, insurer must look beyond the effect of the pleadings); *Miller,* 200 P.3d at 424 ("Under Kansas law, lawsuit pleadings are merely a starting point for the duty to defend analysis. They are 'not dispositive.'").

After the jury entered its verdict, and while the Ameristar Lawsuit was on appeal, Dodson again approached National Union seeking coverage. National Union was on specific notice by at least this point that Dodson claimed the damage to the Aircraft occurred after the Aircraft left its care, custody, or control. The jury's apportionment of partial fault to Ameristar was consistent with Dodson's contention. National Union sought an opinion letter relating to coverage. In that opinion let-

ter, attorney Gunderson confirmed his belief that the care, custody, or control exclusion applied. Curiously, notwithstanding Gunderson's expressed confidence in the denial of coverage, he counseled against National Union filing a declaratory judgment action to determine coverage as his "general rule-of thumb relative to declaratory judgment actions is, unless you are confident you will get summary judgment, don't file it." Gunderson also acknowledged *Buchanan v. Employers Mutual Liability Insurance Company,* 201 Kan. 666, 443 P.2d 681, 682–83 (1968), where the Kansas Supreme Court concluded that "[t]he 'care, custody and control clause' frequently found in liability insurance policies is of a generally ambiguous character and must be applied to the facts of each individual case with common sense and practicality."

The trial court found that the January 6, 2003 denial letter from Gunderson to Dodson acknowledged "Dodson's contention that the temporary distortion of the fuselage may well have developed after Dodson's work was completed and that a proper investigation at the time could have revealed the timing of the damage." National Union does not contest this finding. National Union's 2003 decision to restate its denial of coverage thus ignored the presence of a factual dispute about *when* the damage to the Aircraft occurred, notwithstanding Gunderson's opinion letter advising that the application of the care, custody, or control exclusion is "fact driven."

The sound discretion of the trial court in finding that a denial of coverage was without just cause or excuse will not be disturbed on appeal absent a showing of an abuse of discretion. *Johnson,* 135 P.3d at 1135. Discretion is abused where no reasonable person would adopt the trial court's view. *Id.* We see nothing in this record which would permit us to conclude that the trial court abused its discretion in finding that National Union denied coverage without just cause or excuse under section 40–256.

Point three is denied.

### Conclusion

We affirm the trial court's judgment.

All concur.